**Marvin ELY, Appellant,**

v.

**Edward E. REICHE et al., Appellees.**

**No. 7369.**

Court of Civil Appeals of Texas.

Texarkana.

May 8, 1962.

Rehearing Denied May 29, 1962.

Blades, Crain, Slator & Winter, Houston, for appellant.

Will Wilson, James H. Rogers, Tom Burrus, Attys. Gen., Austin, William R. Long, III, University of Texas, Austin, Smith & Lehmann, W. Scott Red, Houston, for appellee.

CHADICK, Chief Justice.

Although it is somewhat unsatisfactory to do so, reference will be made to the dissenting opinion for the essential facts in this case. Avoiding repetition is to be preferred to increasing the literary output of this court in disposing of the case.

It seems settled beyond doubt that the declarations of the Testator, Mrs. McLeod, have no probative weight as proof of the conduct, words, or acts of Edward E. Reiche that are claimed to have exerted an undue influence upon her in making her Will. Scott v. Townsend, 106 Tex. 322, 166 S.W. 1138; Self v. Thornton, Tex.Civ.App., 343 S.W.2d 485, N.R.E.; 1 Texas Law of Evidence 666, Sec. 894. Mrs. McLeod's declarations in that respect are to be disregarded as evidence of undue influence.

The record shorn of Mrs. McLeod's declarations contains no circumstance or evidence of conduct, acts, or statements from which it may be inferred or deduced that appellee Reiche exerted a devious, malign and insidiously compelling pressure to

overcome or subvert the free volition of Mrs. McLeod in making a testamentary disposition of her property.

■ A practicing physician testified by deposition. Four of the questions propounded to him, and the answers thereto, were offered in evidence by the appellee, and were read to the jury over the objection of the appellant that the questions were leading. The trial court's error in permitting the questions and answers to be read to the jury, though the questions were leading, are not shown to have amounted to such a denial of the right of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in the cause. Of course leading and suggestive questions should be avoided in the interest of orderly procedure and justice, but this error of law does not appear to have had any material effect upon the outcome of the case when the record as a whole is considered.

No error requiring a reversal of the judgment is shown. This court must affirm the trial court judgment, and it is so ordered.

FANNING, J., concurs in affirmance.

DAVIS, J., dissents.

DAVIS, Justice.

I dissent. The following was written to be the opinion of the Court. I now file it, with minor changes, as my dissent.

Dorothy Calvert McLeod, a widow, executed a Will on June 20, 1958. She died July 16, 1958. The Will was filed for probate on July 22, 1958. She was 49 years of age at the time of her death. She died of cancer. By the Will, she willed to the appellant $500.00. She willed to the appellee Edward E. Reiche 300 shares of stock. She directed the Independent Executor, appellee Reiche, to dispose of all her personal effects, because he was thoroughly familiar with her affairs and wishes. The rest and residue of her estate, she willed to The Social Service Patient Welfare Fund of M. D. Anderson Hospital.

Appellant filed a contest in the probate court. From an Order in the probate court admitting the Will to probate, appellant perfected an appeal to the District Court. In the District, as in the Probate Court, he contested the Will on the grounds that Mrs. McLeod lacked testamentary capacity at the time of making the Will, and that the Will was obtained as the result of undue influence exerted over her by the appellee, Edward Reiche, the principal beneficiary under the Will.

In the trial to a jury, the jury returned a verdict that Mrs. McLeod had testamentary capacity at the time of making the purported Will; but, Mrs. McLeod was acting under undue influence on the part of Edward Reiche at the time of the signing of the purported Will. Appellant filed a motion for a judgment. The appellee filed a motion to disregard the findings of the jury that Mrs. McLeod was acting under undue influence on the part of Edward Reiche at the time of signing the purported Will on the grounds that there was *no evidence* to support such finding. The trial court sustained appellee's motion. A motion for new trial was overruled, and the appellant has perfected his appeal.

By his first two points, appellant takes the position that the trial court committed errors in finding that no evidence was admitted to show undue influence. He says the evidence was sufficient. The evidence of the exercise of undue influence was more than ample to support the jury's verdict and finding to that effect. I will outline some of the evidence that will support the jury's finding.

The evidence discloses that prior to the time she made the purported Will she made a trip to Europe in 1956; that she made a Will in favor of the appellant. There was no evidence as to what became of that Will. There was testimony that Mrs. McLeod was

aware that if she died intestate, that her property would go to her only surviving relative, the appellant. The evidence shows that Mrs. McLeod was extremely fond of the appellant, and prior to obtaining her last employment, she had sought employment near Washington, D. C., the place where the appellant lived, so as to be nearer to him.

Prior to Mrs. McLeod's last illness, Edward Reiche had been her advisor and confidante. He was thoroughly familiar with her affairs. A letter addressed to Reiche on the same day she signed the Will, which letter was prepared by the attorney who actually prepared Mrs. McLeod's Will that was signed on June 20, 1958, is proof that he was her confidante. Paragraph 4 of the purported Will reads as follows: "I, Dorothy Calvert McLeod, hereby direct that all of my personal effects are to be disposed of at the direction of my Independent Executor, hereinafter named, *who is thoroughly familiar with my affairs and my wishes in that regard.*" (emphasis added).

She appointed Edward Reiche as Independent Executor. In the letter that she signed on June 20, 1958, to Edward Reiche the first paragraph reads as follows: *"You are, of course, thoroughly familiar with my affairs from my having discussed the same with you."* (Emphasis added). The last paragraph of the letter reads as follows: "Any of my other personal effects you may dispose of as you deem fitting and proper." That letter was written by Attorney Red who prepared the Will.

Mrs. McLeod had, prior to her last illness, been friendly with Reiche and his wife. Prior to her death, she had often listed Mrs. Reiche as the person to be notified in case of an emergency. Prior to her death, after the purported Will was signed, she refused Reiche permission to come into her room, and she did not list Mrs. Reiche as the person to be notified in case of an emergency.

Mrs. McLeod became ill in March of 1958. She had an exploratory operation. They discovered that she had terminal cancer of the lower large intestines. They removed part of her large intestines. Thereafter, she had a colostomy (no control over her bowels). She could not live more than a year. She immediately began to lose weight, and always suffered severe and excruciating pain. Prior to that time, she was apparently a healthy woman, was jovial, and enjoyed living. After the operation, she became depressed. She knew her mother and father had died of cancer. She knew that her husband had died in 1952 of leukemia, a form of cancer. She had no children. She also knew that death was not far away. As testified by one of the nurses: "It amounted to pain and depression, which is common with cancer patients. You know, a person who is about to be electrocuted, it isn't the sentence he pays for his crime that kills him, its that long period of waiting."

Prior to making the Will, Mrs. McLeod told witnesses on many occasions that the Reiches were insisting that she make a Will, and that it looked like the Reiches were trying to get everything. Reiche called an attorney, Scott Red, a stranger to Mrs. McLeod, and asked him if he would prepare the Will. Prior to making the Will, she told Reiche that she did not desire to make a Will, and Reiche called Scott Red, and told Red that *she did not desire to make a Will.* On June 20, 1958, about 10:00 o'clock A.M., attorney Red called Mrs. McLeod on the telephone. On this date she was an extremely sick woman. Attorney Red wanted to come to her apartment and talk to her about the Will. Mrs. McLeod was notified of the call, and her response was that she did not feel like doing it. But she said, "I might as well get it over with because they are not going to give me *any peace.*" (Emphasis added). Attorney Red went to the apartment and talked with her, and then went back to his office and prepared the Will. Attorney Red returned to the apartment about 1:00 o'clock. Miss Ruth R. Creed, a school teacher, and Mrs. Coin Douglas, a nurse,

were there as witnesses. The testimony of the witnesses was to the effect that Mrs. McLeod did not have the mental capacity to know and understand exactly what she was doing at the time that she signed the Will. But the jury found that she did have mental capacity. Prior to this time, attorney Red did not know Mrs. McLeod. A strange attorney called to write a Will for a dying woman.

Mrs. McLeod made the statement at the time she signed the Will, or shortly thereafter, that the Will would have to be changed. Shortly after attorney Red left the apartment of Mrs. McLeod she made the statement that he had "loused her up with Marvin", (the appellant). At the time she signed the Will, she was a sick woman, and as soon as attorney Red left her apartment, she had to have a shot of codeine, she vomited, and had a very bad nervous reaction. She cried all the afternoon. It was one of her worst days. She was dying of terminal cancer, and actually passed away 26 days thereafter.

On being questioned as to the type of pain that she was having, the nurse testified as follows: "Yes, definitely. Definitely. Only God in Heaven can know what they suffer. It is the worst pain that a human being can suffer." As evidence of the great pain with which she was suffering, she was receiving heavy doses of narcotics and other sedatives. The day before she signed the purported Will, she received a number of shots of demerol, several doses of codeine, numerous doses of paregoric, and several doses of senacol. She also received doses of demerol, paregoric and codeine on June 20, 1958, prior to the time she signed the purported Will. She had lost weight to the point of being emaciated, was nauseated, vomiting, and was having trouble with her breathing. About twelve days after she signed the purported Will, she developed diplopia or double vision. The records of the M. D. Anderson Hospital showed that she had some dyspnea and orthopnea.

According to the evidence, Mrs. McLeod on two separate occasions, after the purported Will was signed and prior to her death, attempted to change the disposition of the property other than that as specified in the Will. Reiche prepared one of the instruments and carried it to the hospital, but she refused to let him enter the room. She signed the instrument, and it has been admitted in evidence; in that instrument she only left the Reiches an FM radio. She dictated to Mrs. Coin Douglas a request relative to the disposition of her property after her death.

There is no evidence in the record of any contributions or gifts by Mrs. McLeod to the Social Service Patient Welfare Fund of M. D. Anderson Hospital. As a matter of fact, she did not have her operation in the M. D. Anderson Hospital. Prior to her death, she became peeved at the doctor that did the operation, and also became very angry with the M. D. Anderson Hospital.

Reiche was not physically present when the Will was signed, yet the fact remains that shortly after the Will was signed he obtained possession of the Will and removed it from Mrs. McLeod's apartment and put it beyond her reach in a safety deposit box at the University State Bank, where the Will was found after Mrs. McLeod's death. Reiche had a motive other than mere financial gain; he was gradually losing his eyesight.

As hereinabove stated, she had previously refused to make a Will. The Reiches would not let her have any peace. Prior to the time she signed the purported Will, she made the statement that "the Reiches are trying to get it all"; "it looks like the Reiches are trying to get it all"; and, "You can't trust anybody." At the time she signed the purported Will, she made the statement that the Will would have to be changed. After she signed the purported Will she made the statement that attorney Red had loused her up with Marvin.

Prior to signing the Will, Mrs. McLeod signed an order to the Teacher Retirement

System of the State of Texas designating Seldon Marvin Ely as the beneficiary to the retirement fund. Immediately prior to signing the Will, she changed the beneficiary in a life insurance policy from her deceased husband to Seldon Marvin Ely. This change of beneficiary was signed on June 12, 1958, and the change of beneficiary was actually made on June 17, 1958. Reiche and attorney Red found the insurance policy, and they have kept the same. According to the evidence, they refused to deliver the policy to Mr. Ely, the appellant, and they had the same (in their possession) at the time of the trial. (The appellant had collected the insurance).

Attorney Red, as a notary public, took the self-proving acknowledgments to the Will. He filed the Will for probate. On being interrogated about it, he swore that Mrs. McLeod had hired him, and had paid him to do so. The evidence shows that he was only paid $50.00.

Mrs. Harriet Tefteller, a nurse who was put on duty on June 19, 1958, testified that Dr. Edwards called on the telephone one time and talked to Mrs. McLeod. He told her that he wanted her to get rid of the nurse. To which she replied: "You've been talking to the Reiches." Then she said: "See, the Reiches are wanting the doctors to get rid of you". This action is wholly unexplained. Mrs. Tefteller testified: "Her eyes were weak, and (she was) pale and emaciated, and vomiting every few minutes". As to her sleep the night of June 19, 1958, Mrs. Tefteller testified: "She was restless. Just a fitful sleep. Dozed off for a few minutes and then she would either have to have her dressings changed or she would vomit or be in great pain."

When attorney Red came to Mrs. McLeod's apartment on June 20, 1958 about 10:00 o'clock A.M., he was permitted to see Mrs. McLeod, alone, in the room. When he returned about 1:00 o'clock, he went into the room with Mrs. McLeod, alone, where he stayed for a short period of time. Then,

Miss Creed and Mrs. Douglas went into the room and witnessed the signing of the Will. Miss Creed was positive that Mrs. McLeod did not understand what she was doing at the time she made the Will. Neither did either of the nurses. She had often complained to the nurses about not having enough money to pay them all their salaries, and at the time of her death, there was money due to each of them. Her estate amounted to an excess of $28,000.00.

Mr. Ely, the appellant, was the only surviving relative of Mrs. McLeod. Their mothers were sisters. It appears that during the last illness of Mrs. McLeod's parents, Mr. Ely and his parents were quite helpful to them. They contributed to their support.

There was some evidence in the record that Reiche was guilty of using undue influence upon Mrs. McLeod in order to get her to make the Will. The Will was an unnatural Will, they wouldn't allow her any peace, and the Will was contrary to her expressed wishes and desires.

Under the provisions of Rule 301, Vernon's Ann.Tex.Rules of Civil Procedure, the trial court must find that there is no evidence of probative force before he can disregard the jury finding in entering a judgment. To sustain the action of the trial court in disregarding the jury findings there must be no evidence of probative force to support the verdict. Parham v. Norwood, Tex.Civ.App., 329 S.W.2d 506, 509, W.R., N.R.E.; Iowa Mutual Insurance Company v. Redden, Tex.Civ.App., 326 S.W.2d 727, W.R., N.R.E.; Collier v. Hill & Hill, Exterminators, et al.; Tex.Civ.App., 322 S.W. 2d 329, 73 A.L.R.2d 1141, N.W.H.

To prove undue influence against a person in the execution of a Will presents quite a problem. Every case must rest on the evidence in that particular case. 42 T.J. 792, Sec. 2, p. 793, Sec. 4, p. 795, Sec. 6, p. 797, Sec. 7; 95 C.J.S. Wills § 462, p. 421, § 463, p. 434; Long v. Long, 133 Tex. 96, 125 S.W.2d 1034; Pollard v. El Paso National Bank, Tex.Civ.App., 343 S.W.2d

909; 1 McCormick and Ray, Texas Law of Evidence 101, Sec. 87, and authorities cited therein. See also, 1 McCormick and Ray, Texas Law of Evidence 659, Chapt. 12, especially Sec. 894.

The jury after hearing and considering the evidence, found that the Will was the result of undue influence exercised over Mrs. Dorothy McLeod by Edward Reiche. To support this finding, they had to rely upon circumstantial evidence. In this case, there was plenty of circumstantial evidence to prove that Reiche had persuaded Mrs. McLeod to make the Will in question. There was a confidential relationship that existed between them for many years. Reiche was an advisor of Mrs. McLeod. He took advantage of her feeble condition; he wouldn't allow her any peace. He called attorney Red and asked him if he would write the Will. He later called Red and told him she did not want to make a Will. Then he called Red again and told him she wanted to make a Will. Reiche no doubt gave Red her name, address and phone number. Considering her great pain, physical suffering and drugged mind, he wouldn't allow her any peace, he cajoled and insisted and repeatedly worried and harried Mrs. McLeod until he drove her to the point where she agreed to sign the Will, even though it was not what she wanted, and was not intended by her to be her last and final Will. As soon as the Will was signed, he got possession of it and carried it to the bank and placed it beyond her reach. Mrs. McLeod later signed another instrument that she had insisted be prepared, and in that instrument she only left the appellee an FM radio. These things he did out of the presence of any other witnesses who could see and hear what he said, the things he did, and then appear in court and testify. Yet, the circumstances as hereinabove set out and proved before the jury were sufficient to prove that there was undue influence exercised over Mrs. McLeod by Reiche. In the case of Holt v. Guergin, 106 Tex. 185, 156 S.W. 581, affirmed by the Supreme Court, 106 Tex. 185, 163 S.W. 10,

50 L.R.A.,N.S., 1136, we find the following language:

> "The existence of undue influence is a question of fact, and from its very nature, like all fraudulent and vicious schemes, hides its features behind masks and operates in dark and secret places and in covert ways, and proof of it must usually be by circumstantial rather than by direct testimony. Those circumstances may be the condition of the testator's mind, his age, weakness, and infirmity, his surroundings and the circumstances attending the execution of the will, the opportunity for the exertion of such influence as would trammel or destroy the exercise of free agency and the disposition of the property, *the words and acts of testator and beneficiary,* the existence of *confidential relations between them,* and the injustice, and unreasonable and *unnatural character of the will.*" (Emphasis added).

In Ayala v. Maume, Tex.Civ.App., 318 S.W.2d 698, er. ref., n. r. e., the court said: "In such a case it is not enough that it is not clear that the verdict is right; but it must clearly appear that it is wrong, to induce the court to set aside the verdict." Pollard v. El Paso National Bank, Tex.Civ.App., 343 S.W.2d 909, wr. ref., n. r. e.; Gunlock v. Greenwade, Tex.Civ.App., 280 S.W.2d 610, wr. ref., n. r. e.; Lee v. Daugherty, Tex.Civ.App., 281 S.W.2d 192, wr. ref., n. r. e.

In the case of Buchanan v. Davis, 12 S. W.2d 978, 981, the Commission of Appeals affirmed a jury verdict that undue influence was used. Bearing in mind the condition of Mrs. McLeod at the time she signed the Will, together with all things the appellee did to her, I think the following excerpt from the case is appropriate:

> "It is known to us all that whatever hurts the flesh reacts somewhat upon the media of intelligence; and the idea that injury to or impairment of one part of the finely poised organism does

not to some extent impair all others has repudiation in the general experience and observation of mankind. In consequence, physical condition is a circumstance entitled to consideration in the ascertainment of intellectual state."

Mrs. Ophelia Buchanan was suffering with cancer. She signed the Will on August 3, 1917. She died August 20, 1917. The evidence in that case is not any stronger than that in this case. The judgment was permitted to stand.

In the case of Long v. Long, supra, the court had this to say:

"It is rarely possible to prove undue influence by what is generally known as direct testimony. Undue influence is usually a subtle thing, and by its very nature it usually involves an extended course of dealings and circumstances. Usually a person charging undue influence must substantiate such charges by circumstances extending over a considerable length of time. It is therefore the settled rule that undue influence can be established by what is known as circumstantial, as well as direct, evidence. [Citing cases.]

"Undue influence and mental incapacity are two distinct grounds for voiding a will. Undue influence in its essential elements has no real relation to mental incapacity. Mental incapacity implies the lack of intelligent mental power; while undue influence implies within itself the existence of a mind of sufficient mental capacity to make a will, if not hindered by the dominant or overriding influence of another in such a way as to make the instrument speak the will of the person exercising undue influence, and not that of the testator."

The Statement of Facts contains plenty of evidence of probative force to support the jury's verdict of undue influence. Scott v. Townsend (Tex.Sup.Ct.) 106 Tex. 322, 166 S.W. 1138; Sockwell v. Sockwell, Tex.Civ. App., 166 S.W. 1188, wr. ref.; Craycroft v. Crawford, Tex.Civ.App., 285 S.W. 275, er. ref.; Long v. Long, supra; McKay v. McKay, Tex.Civ.App., 189 S.W. 520; Truelove v. Truelove, Tex.Civ.App., 266 S.W.2d 491; In Re Est. of Flora Ann Pool Olsson, Tex.Civ.App., 344 S.W.2d 171, wr. ref., n. r. e.; Campbell v. Barrera, Tex.Civ.App., 32 S.W. 724, n. w. h.; Marshall v. Campbell, Tex.Civ.App., 212 S.W. 723; Reinhardt v. Nehring et al., Tex.Civ.App., 283 S.W. 347, reversed on other grounds; Ford v. Ross, 150 S.W.2d 144, n. w. h.; Barksdale v. Dobbins, Tex.Civ.App., 141 S.W.2d 1035, er. ref.; Venner v. Layton, Tex.Civ.App., 244 S.W.2d 852, wr. ref.; Gunlock v. Greenwade, Tex.Civ.App., 280 S.W.2d 610, n. r. e. I would sustain points One and Two.

By his third point of error, appellant takes the position that the trial court erred in admitting certain testimony of Dr. Robert A. Edwards. The questions asked were leading and suggestive. They should not have been admitted in evidence. Wilkinson v. Wilkinson, Tex.Civ.App., 322 S.W.2d 662, err. dism. I will not go into detail and discuss the questions and answers. They were as to the mental condition of Mrs. McLeod prior to her death. The two nurses and Miss Creed both testified that she was not mentally competent to know what she was doing when she executed the Will. I can see where the testimony of Dr. Edwards probably caused the jury to find that she was of mental competence. I would sustain point Three.

The evidence in this case is stronger than in Long v. Long, supra. Irrespective of the statements made by Mrs. McLeod, the following, I believe, to be sufficient evidence to sustain the findings of the jury, that the Will was made as the result of undue influence. Reiche called attorney Red and asked him if he would write the Will. Later, Reiche called Red and told him that *she did not want* to make a Will. Then, Reiche called Red and told him that she did want to make a Will.

Prior to making the Will there is evidence that Mrs. McLeod had already made a Will in favor of Mr. Ely. There is no evidence as to what became of that Will. There is evidence that Mrs. McLeod made Mr. Ely the beneficiary to her Teacher-Retirement Fund. There is evidence that Mrs. McLeod changed the beneficiary of an insurance policy immediately before her death. (They still have the insurance policy). There is evidence that they would not grant her any peace until she made the Will. There is evidence that Reiche immediately secured possession of the Will and carried it to a bank deposit box. There is evidence that Reiche wrote another instrument that Mrs. McLeod actually signed in which she only left the Reiches an FM radio.

There is evidence that Mrs. McLeod prior to making the Will listed Mrs. Reiche as the person to be notified in case of an emergency. After the Will was signed and she re-entered the hospital she did not list Mrs. Reiche as the person to be notified. Reiche and Mrs. McLeod were at one time extremely close friends, as evidenced by the Will and the letter that was written by Red on the day that she signed the purported Will. (Where did Reiche get the key to Mrs. McLeod's lock-box where he put the will?)

There is evidence that attorney Red took the acknowledgment to the purported Will, and then he filed the Will for probate. He testified that Mrs. McLeod had hired him and had paid him. The evidence only shows that she had paid him $50.00. There is evidence that Mrs. McLeod became angry at the M. D. Anderson Hospital prior to her death. There is evidence that immediately after she signed the Will she had to have a shot of codeine. She vomited; and that evening she had one of the worst evenings imaginable. Her mind was drugged by taking demerol, paregoric, senacol, and codeine.

There is evidence that she refused Reiche permission to come into her room after the purported Will was signed. All of these facts, irrespective of the statements made by Mrs. McLeod, are sufficient to prove that they used undue influence upon a dying woman; a woman who was dying of one of the most horrible diseases imaginable. As I see it, Reiche and the M. D. Anderson Hospital are taking property that legally, and as a matter of MORAL DECENCY, belongs to Marvin Ely.

For the errors hereinabove pointed out, I would reverse the judgment of the trial court and render judgment denying the Will to probate.