**NEW YORK CENTRAL MUTUAL FIRE INSURANCE COMPANY, Appellant,**

v.

**J. Simms McDONALD, Appellee.**

No. 11132.

Court of Civil Appeals of Texas.

Austin.

Jan. 8, 1964.

Rehearing Denied Jan. 29, 1964.

Bryan & Patton, Julietta Jarvis, Houston, for appellant.

Harris, Salyer & Taylor, Bay City, for appellee.

PHILLIPS, Justice.

The plaintiff brought suit in the court below against the defendant Insurance Company on an insurance policy alleging damages to his beach house resulting from Hurricane Carla. The beach house had been located on the edge of Turtle Bay in Matagorda County and completely disappeared sometime during the hurricane.

The insurance policy involved in this suit provided coverage for windstorm, but excluded coverage for damage by water or a combination of water and wind. The plaintiff alleged the damage was due to windstorm and the defendant pleaded the exclusion, tidal wave, high water, or overflow, whether driven by wind or not.

The jury found that the damage was caused by the wind, was not caused by water, and was not caused by a combination of wind and water. Both defendant's motion for an instructed verdict and motion for judgment notwithstanding the verdict were overruled by the court and judgment entered for the plaintiff for the face amount of the policy less certain deductible items and defendant has duly perfected an appeal to this Court.

The parties will be referred to in this opinion as they were designated in the court below.

The defendant's first thirteen points of error jointly briefed complain among other things, that the court erred in overruling its motion for an instructed verdict and later in overruling its motion for judgment notwithstanding the verdict inasmuch as there was no evidence to support the jury's verdict that the damage to plaintiff's beach house was covered by the policy sued upon in that there was no evidence that such damage was caused by the wind, and no evidence that it was not caused by the water or the concurring action of wind with rising water and wind driven water.

We hold that the defendant's contention is correct and reverse and render the case.

The high wind and water caused by Hurricane Carla occurred, for the most part, between the 9th and 11th of September,

1961. This was Saturday through Monday. It is undisputed that between these dates the wind rose to a velocity of between 150–170 mph; that the area where the beach house in question once stood was inundated with water spreading some two or three miles inland, with waves that "looked like mountains" and water some fourteen to fifteen feet above normal. That no one knows how the beach house in question disappeared as no one saw it disappear.

The house was standing in good condition at 7:30 A.M. on Saturday, September 9, when the plaintiff left it, and when he next returned on September 13, after the storm, the house was gone. Plaintiff does not know what caused the destruction of the house. He estimated the height of the water in and around his house at fourteen to fifteen feet.

The plaintiff sought to prove by circumstantial evidence that his beach house blew away. This attempt was made largely through the testimony by deposition of a Mr. Bernard Jensen and his wife who lived in a house some two miles from the beach house in question and ran cattle in the area as a livelihood.

Mr. Jensen's home and cattle range was on abandoned Army Camp Hulen, which range included a peninsula that jutted into Turtle Bay like a giant forefinger somewhat less than a mile across the bay from the point where plaintiff's beach house was located. Jensen and his family spent the Sunday and Monday of the storm in a concrete refrigeration building at Camp Hulen and he made several trips onto the peninsula to drive cattle back from the high water.

Plaintiff's case is largely predicated on three trips Jensen made onto the above described peninsula on Sunday, September 10th and two trips on Monday, September 11th.

Jensen testified that on the three trips out on the peninsula on the 10th, one at 9 to 10:30 A.M., one at 1:00 to 2:30 P.M. and the last from 3:00 to 4:30 P.M. the water level was from eighteen inches to two feet over mean low tide, estimated wind at 100 mph. and on neither trip could he see across the bay to the shoreline where plaintiff's beach house had been located. On September 11th Jensen made two trips; one at 9 A.M. when Jensen had to stop his car at the neck of the peninsula due to the water level. He testified that the wind at this time was 125 miles an hour by his own personal estimate. At this time he could not see across the bay or see the area in which the house in question was located. The last trip was sometime between two and four P.M. when Jensen had to stop at the same point as in the trip immediately preceding. He estimated the wind at this time to be 150 miles an hour. Around 4:00 P.M. on this same day and apparently at the end of this second trip, Jensen testified that the lull of the storm began and he could see across the bay for the first time at which time all that he could see in the vicinity of the plaintiff's former house location were highline poles. There had been other houses near the plaintiff's house and apparently they too were gone.

Between the time the storm began on Saturday and 4:00 P.M. on Monday Jensen could not see across the bay. He does not know how or what caused plaintiff's house to disappear.

Part of the deposition wherein defendant's counsel questioned Jensen was as follows:

"Q. All right, and when had you—after you had gotten these cattle back when had you gone into the refrigeration place to stay?

"A. You mean personally?

"Q. Well yes, until you rode the storm out.

"A. The last trip we made to see about the cattle was approximately—we left approximately two o'clock on Monday.

"Q. That is two P.M.?

"A. Yes, sir that is, that is when we left the refrigeration building.

"Q. And got back to there about what time?

"A. Well while we were out there moving the cattle when we went back out there again well we were seeing this water and watching the big seas that was out in the Bay, it looked like big mountains out in the Bay, you see, there's two Bays.

"Q. Yes, sir I realize that.

"A. And the lull came while we were out there.

"Q. All right now then, you say it looked like mountains, would you say the waves were fifteen or twenty feet high?

"A. Yes, sir.

"Q. Easily that high?

"A. Yes, sir.

"Q. And of course you would agree wouldn't you except for the concrete building that was there it would break up anything that they worked on, wouldn't you?

"A. Yes, sir."

Mrs. Jensen's testimony was that the water came in through the pipes and up through the floor of the concrete refrigeration house and was about three feet deep in the house when they went up on the roof after 4 o'clock Monday afternoon and the waves were splashing at least eight feet high and were carrying trees and part of houses. The testimony of both Mr. and Mrs. Jensen, eye witnesses to the storm, shows that they sought protection against the waves and water, not the wind. They feared damage from the powerful waves "like mountains." The building was well up off the ground, the floor being level with the bed of a truck. They moved to the roof of the building when the water was only six inches inside because the waves outside were over eight feet high.

Appellee builds his case through analogy stating that the jury could not have answered other than it did. His reasoning is to the effect that the first winds of the hurricane were from the northeast blowing the water out of the bays, that the strongest winds preceded the lull. That after the lull the wind shifted to the southeast blowing the water landward. That at 4 P.M. on Monday, the 11th, when Jensen could first see across the bay, was the time when the lull began and all he could see was high-line poles. That coupled with the fact that Jensen had driven out on to the peninsula three times on Sunday and as far as the neck of the peninsula on Monday proved that the wind was the sole proximate cause of the disappearance of the house and not water or wave action or a combination of both.

An examination of the record does not bear this out.

The morning of Monday, September 11, the undisputed testimony shows that Jensen had to stop his car at the northeast mouth of the point between Turtle Bay and Tres Palacios Bay because the entire point was flooded. This means that part of the peninsula across the Bay from plaintiff's house location was flooded at this time.

While Jensen testified that the winds on Sunday, the 10th, were 100 mph, data from the Palacios F.A.A. Station two miles from the site in question disclosed that the wind on that day was 41.4 mph. Plaintiff himself testified that his house had withstood gales of 75 mph in the past losing only a few shingles.

While Jensen testified that the elevation at Camp Hulen was approximately the same as the location of plaintiff's beach house, this testimony is vague and his testimony as what part of the peninsula was covered with water during any specific time is also vague and extremely uncertain. In fact when Jensen testified that during the lull of the

storm when he could look across the bay and see the location where the beach house had once stood and stated that all he could see was highline poles, he does not state whether the poles were standing in water or on dry land.

Defendant introduced exhibits to the effect that the peak gusts on September 11 (Monday) were estimated at 175 mph at Port Lavaca, 160 mph at Matagorda, and 150 mph at Aransas Pass. That the high tides began affecting the upper Texas coast on Friday, September 8; that the peak tides during the storm were 18.5 feet at Port Lavaca and 16.6 feet at Matagorda. Plaintiff's house was on the edge of the bay approximately midway between these areas.

The plaintiff has the burden of proving that the loss was covered by the policy, Coyle v. Palatine Insurance Company, Tex. Com.App., 222 S.W. 973, opinion adopted by the Supreme Court.

In the Coyle case the facts were identical with those at bar with one difference in that it was stipulated between the parties that there was no way of knowing what damage to the house was caused by wind or what damage was caused by water. The court held that the effect of this stipulation was to exclude the loss in controversy from the indemnity provided by the policy. That indemnity was only against direct loss or damage by the wind such as we have in the case before us. The court stated:

"This means, and can only mean, a loss resulting from the wind and no other cause, and fairly capable of establishment as having been so caused. It would make a different contract for the parties to say that it contemplates a loss, not directly due to the wind alone, but to the wind and an expressly excepted cause, combined, with the part for which the wind might be responsible impossible of determination and hence purely speculative. No liability could be adjudged under the pol-

icy which was not proven. * * * If so, a loss within the contract was not established."

The evidence in the case at bar is that there was either enough wind or enough water or a combination of both to have destroyed the beach house. These elements are so intertwined that there is no competent evidence to separate the one from the other in the point of time. While there was evidence of extremely high wind, the evidence that this alone was the proximate cause of the damage comes under the scintilla rule announced in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059. Any inferences so drawn from the plaintiff's testimony are purely speculative and hence not evidence.

Reversed and rendered that plaintiff take nothing.

Reversed and rendered.