J. Sims McDONALD, Petitioner,

v.

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE COMPANY, Respondent.

No. A–10025.

Supreme Court of Texas.

June 10, 1964.

Rehearing Denied July 15, 1964.

Harris, Salyer & Huebner, Bay City, Hill, Brown, Kronzer, Abraham, Watkins & Steely, Al Taylor, Houston, for petitioner.

Bryan & Patton, Julietta Jarvis, Houston, for respondent.

CULVER, Justice.

Petitioner, McDonald, brought this action against New York Central Mutual Fire Insurance Company to recover for the destruction of his house located in Matagorda County under the terms of a policy of insurance issued by that company. The policy covered loss caused by wind and hurricane but excluded loss caused by tidal wave, high water or overflow, whether driven by wind or not.

The jury found that the winds of the hurricane directly and proximately caused the loss and damage; that the loss was not caused by tidal wave, high water or overflow whether driven by wind or not and that the loss did not result from the combined action of the wind, tidal wave, high water or overflow. Based on this verdict the trial court entered a judgment in favor of McDonald and against the Insurance Company. The Court of Civil Appeals reversed and rendered judgment that McDonald take nothing, holding that the jury's findings failed to be supported by the evidence. 374 S.W.2d 767. From a review of the record we reach a conclusion to the contrary.

Admittedly the house was totally destroyed at some time during the passage of Hurricane Carla through this area in September of 1961. It was one of the most destructive storms that has visited the Texas Coast so far as property loss is concerned. Mr. McDonald left his house on Saturday morning, September 9th, and when he returned on Wednesday, the 13th, the house was gone. The evidence bearing on the loss is circumstantial. The only testimony was given by Mr. and Mrs. Jensen who lived nearby and rode out the storm in a concrete building. The remainder of the evidence consisted of maps and official records and reports.

McDonald's house was located on Turtle Bay about 6 feet above water level at mean low tide and was supported on pilings approximately 4 feet above the ground. Turtle Bay, so-called, is a rather long, narrow inlet generally about a mile in width extending in a northeasterly direction from Tres Palacios Bay, a much larger body of water. Palacios Bay in turn forms a small and the upper part of Matagorda Bay, which is some 15 miles in width. Between Turtle Bay and Tres Palacios Bay there extends a long narrow peninsula almost the entire length of Turtle Bay. Mr. Jensen lived and grazed cattle on the land formerly the site of Camp Hulon west of the town of Palacios. McDonald's house was located on the west side of Turtle Bay directly across from Camp Hulon.

On Sunday, September 10th, Jensen and his wife made several trips down this peninsula to move his cattle back from the water's edge where they had drifted or were blown by the wind. On the morning of that day he went to the end of the long peninsula and found that the water level was 18 inches to two feet over mean low tide. At that time he could not see across the bay on account of the rain. In the afternoon he made two similar trips for the same purpose and found the conditions the same as they existed at the time of the first trip. In his opinion the wind was blowing from the northeast at the rate of 100 miles per hour. On the morning of the following day, Monday, September 11th, he drove his car out on the peninsula but could get no further than the narrowest part of the peninsula which was about a mile from the tip end. The elevation at that point is about the same as that across Turtle Bay where the insured property was located. At that time Jensen still could not see across the bay. According to him the wind velocity had increased to about 150 miles per hour. Between 3:00 and 4:00 o'clock that same afternoon he made another trip out on the peninsula. At that time the lull came and lasted for about 15 minutes. The rain ceased and he could see across Turtle Bay. McDonald's house was gone and all he saw were the high line poles along where the house had stood. After the lull the water began to rise rapidly and he and his wife hurried back to the safety of the concrete refrigeration building. Mrs. Jensen accompanied her husband on his last trip on Monday and also looked across the bay approximately a half mile to the location of the house and saw nothing standing but the poles.

Introduced in evidence were various official reports, charts and maps from the United States Weather Bureau and the United States Corps of Engineers. It seems to be undisputed that at all times before the eye or center of the storm reached

the Palacios area the wind was blowing from a northeasterly direction. After the eye passed inland, due to the counter-clockwise motion of these hurricanes, the wind was reversed and in the Palacios area blew in the opposite direction. The data introduced in evidence showed that the leading edge of the eye reached Port Lavaca, some 20 miles southwest of the Palacios area between 3 and 4 p. m. Monday, the 11th. In advance of the eye many stations along the Coast that morning reported the highest recorded wind velocity. A peak gust of 170 miles per hour was estimated at Port Lavaca. Gusts of 150 miles per hour were estimated at other nearby points. Sustained winds were reported at more than 115 miles per hour at Matagorda, which is about 15 miles east of Palacios.

The Insurance Company counters with a report from the Palacios Federal Aeronautics Authority station, which recorded that the wind was from the north and northeast on the 10th and that the highest wind observed on that day was up to 48 miles per hour. But the last observation was made at 5:58 p. m. on that day and the station was abandoned shortly thereafter. The report did show that from the beginning of that day the wind was more or less steadily increasing in velocity.

■ So far as the high tides and wind-driven water are concerned the Weather Bureau at Galveston gives a report on the peak flooding at various points along the Texas Coast. The information was collected from all available sources but mostly was obtained from the Army Corps of Engineers. According to this report the peak tide at Port Lavaca was 16.6 feet above mean sea level. Of course to determine the depth of the water above ground at any point the ground elevation must be subtracted. At Port O'Connor the peak was 14½ and at Palacios 15.4. However, at these points the height of the tide was ascertained from an observation of the high-water mark. The report does not profess to determine when the peak was reached. Unquestionably, all of this area was flooded by hurricane-driven water, but we may reasonably infer from the evidence before us that the flooding of this area took place in the second phase of the hurricane after the center had reached the area and after the ensuing lull. Up until that time the wind was blowing from the northeast and was calculated to blow water from Turtle Bay toward the southwest and away from McDonald's house. There were no bodies of water northeast. The Insurance Company lays much stress on the statement made by Jensen that on the occasion of his last visit down the peninsula to round up his cattle early in the afternoon on Monday and before the lull, he watched big waves in the bay "easily 15 to 20 feet high". Certainly he was not talking about any waves in the narrow Turtle Bay, but out into Tres Palacios and Matagorda Bays. Had those waves been sweeping toward the peninsula and toward the property in question, it would seem that Jensen and his wife and automobile would have been swept away. The Company argues that waves always go toward the shore, but with a gale blowing from the northeast at the rate of 100 or more miles per hour, it would naturally be inferred that the water was being blown upon the shores around Port O'Connor and the Matagorda Peninsula. The point where Jensen was standing when the wind ceased blowing and the rain stopped, and he could see across Turtle Bay, was about the same elevation as the location of Mc-Donald's house on the other side of Turtle Bay. In other words we believe the evidence to be conclusive that if on the day previous and at 4:00 o'clock on Monday afternoon the witness could have driven his car out on the peninsula to a point a little to the south of and about a mile from Mc-Donald's house, there had been no flooding or wind-driven waters up to that time which could have destroyed the house. We hold, therefore, that the foregoing jury findings are supported by evidence.

The insurer brings forward as a cross-point that, in the event we should agree that there is evidence to support the jury's findings that the house was destroyed by wind and not as a result of wind-driven water, the cause should be remanded to the district court for a new trial since a finding of no evidence by the Court of Civil Appeals includes necessarily a finding of insufficient evidence.[1] However, the insured does not raise in the Court of Civil Appeals the point of "insufficient evidence" to support the jury findings or the point that the findings are against "the great weight and preponderance" of the credible evidence. Its points are premised on the proposition that the Court erred in entering judgment on the jury's verdict and correspond to the grounds appearing in its amended motion for new trial. The points are in the following form:

"The Court erred in overruling defendant's motions for instructed verdict and judgment n. o. v. and in entering judgment on the jury's verdict because there was insufficient evidence that the damage to plaintiff's beach house was covered by the policy sued upon in that there was insufficient evidence that the damage was caused by the wind and insufficient evidence that it was not caused by water or the concurring action of wind with rising water and wind driven water."

The points do not seek relief from the jury findings on the ground that they are not supported by sufficient evidence or that they are against the great weight of the evidence, but relate only to the type of judgment that the Court entered. They are not applicable to the granting of a new trial after the entry of a judgment. We therefore hold that the points in the Court of Civil Appeals above referred to only raised the legal sufficiency of the evidence or the point of no evidence. Houston Maritime Association v. South Atlantic & Gulf Coast District, I.L.A., Tex.Civ.App.,

367 S.W.2d 705, no writ, 1962; Calvert, 38 Texas Law Review 361.

Further praying in the alternative that the cause be remanded, the insurer asserts that it specially pleaded the exclusion clause of the policy and therefore the burden of proving a loss from a hazard insured by the policy and not excepted by the exclusions should have been laid upon the plaintiff. Coyle v. Palatine, 222 S.W. 973 (Tex.Comm.App.1917); Shaver v. National Title & Abstract Co., 361 S.W.2d 867, (Tex.1962).

This has reference to the form of Special Issues 2 and 3, No. 2 reading as follows:

"Do you find from a preponderance of the evidence that tidal wave, high water, overflow, whether driven by wind or not, * * * directly and properly caused damages to plaintiff's house on the premises in question on or about September 11, 1961 ?"

Number 3 followed the same form reading:

"Do you find from a preponderance of the evidence that the loss and damage to the house of the plaintiff, J. Sims McDonald, was a direct and proximate result of the combined action of the wind of Hurricane Carla and tidal wave, high water or overflow, whether driven by wind or not?"

Rule 274 provides that the objecting party must point out distinctly the matter to which he objects and the grounds of his objections, and where the same are obscured or concealed by voluminous unfounded objections or minute differentiations, the objection shall be deemed to be waived. The matter will bear a somewhat extended discussion.

The first Special Issue read as follows:

"Do you find from a preponderance of the evidence that the winds of Hurricane Carla, on or about September

---

1. Barker v. Coastal Builders, 153 Tex. 540, 271 S.W.2d 798.

11, 1961, directly and proximately caused loss and damage to the house on the property in question?"

To this issue the insurer objected on ten numbered grounds:

"(1) Because there is no evidence to warrant or support the submission of Special Issue No. 1;

"(2) Because there is insufficient evidence to warrant or support the submission of Special Issue No. 1;

"(3) Because the submission of Special Issue No. 1 is against the great weight and preponderance of probative evidence adduced in this case;

"(4) Because such issue in its present form consists of a judicial comment on the weight of the evidence;

"(5) Because such issue is assumptive and presumptive;

"(6) Because such issue amounts to a general charge in a special issue case;

"(7) Because such issue is an irrelevant and immaterial issue in this case;

"(8) Because such issue in its present form puts an improper and onerous burden on the Defendant;

"(9) Because the pleadings as relied on by the Plaintiff do not warrant or support the submission of such issue;

"(10) Because the said Plaintiff, not having borne the burden, no fact issue of any kind has been made to go to the Jury, and the Court is again moved to sustain Defendant's Motion for Instructed Verdict at the end of Plaintiff's case and at the end of the whole case."

■ The first three objections raised only the point of no evidence. Rule 279 provides that a claim that the evidence was

insufficient to warrant the submission of an issue may be made for the first time after the verdict. As they relate to the first special issue the last seven objections, so far as we can observe, had no validity whatever. It could not be contended in good faith that this issue was on the weight of the evidence; that it was assumptive or presumptive; that it amounted to a general charge; that it was irrelevant and immaterial; that it placed an improper burden on the defendant or that it was not supported by the pleadings.

■ The same ten objections were leveled to Issues 2 and 3 as well as to Issues 4, 5 and 7 which inquired whether one McGlathery had filed a sworn proof of loss with the Insurance Company; whether McGlathery was acting as agent for McDonald and what was the actual cash value of the property in question. In each of these issues the burden of proof was properly placed upon the plaintiff. The objection raised by the insurer indiscriminately to all issues was "because such issue in its present form puts an improper and onerous burden on the defendant". Similar objections have been held by Courts of Civil Appeals to be too general to direct the trial court's attention to any error in the charge.[2] It certainly does not as clearly state the nature of the error as the insurer does in its brief filed here in the following language:

"The form of this issue as submitted places the burden of proof on the defendant, rather than on the plaintiff, and allows the jury to find, in effect, that the loss is covered by the policy if the evidence is equal."

If the objection had been presented to the Court in those words there could have been no doubt as to its meaning. But whether or not the objection as presented is too general to merit consideration, we nevertheless say that it is obscured by many

2. Texas-Mexico Railway Co. v. Bell, Tex. Civ.App.1937, 110 S.W.2d 199, no writ; Parker v. Jones, Tex.Civ.App.1939, 130 S.W.2d 1072, no writ; Karotkin Furniture Co. v. Decker, Tex.Civ.App.1930, 32 S.W.2d 703, affirmed 50 S.W.2d 795.

**550**

formal, unfounded and trivial objections. Rule 274.

The late Chief Justice Alexander, in speaking of the reason for the adoption of this rule, had this to say: "It is believed that an objection that is concealed in a mass of immaterial and untenable objections, is as effectively smothered and concealed as one that is counched in veiled and uncertain language." Evidently counsel presented to the trial court the same set of stock objections to each and all issues without any consideration of pertinence or valid relationship. The great majority of them had no legal application and admittedly pointed out no error. In our opinion it does not appear that as to Issues 2 and 3 the trial court was made fully cognizant of the complaint that the burden of proof was cast upon the defendant rather than upon the plaintiff but nevertheless deliberately chose to submit the issue in the form which placed the burden upon the defendant.

For the foregoing reasons the judgment of the Court of Civil Appeals is reversed and the judgment of the trial court is affirmed.