John W. DEAN et al., Appellants,

v.

QUINCY MUTUAL FIRE INSURANCE CO.
et al., Appellees.

No. 4324.

Court of Civil Appeals of Texas.

Waco.

July 29, 1965.

Rehearing Denied Aug. 19, 1965.

Austin Y. Bryan, Jr., Houston, for John W. Dean.

Burke Holman, Houston, for Lititz Mut. Ins. Co.

Thompson, Coe, Cousins & Irons, R. B. Cousins, Dallas, for Quincy Mut. Fire Ins. Co.

TIREY, Justice.

This is a hurricane case. Dean and his wife brought the action on two insurance policies under which claim for loss to a dwelling and the household goods therein situated as a result of said hurricane from September 9th through 12th, 1961. The jury verdict was favorable to the Deans and the trial court rendered judgment for the Deans against the Lititz Mutual Insurance Company which insured only the dwelling but granted motion for judgment notwithstanding the verdict in favor of Quincy Mutual Fire Insurance Company (carrier on household goods) that appellants take nothing. The Deans have perfected their appeal against that part of the judgment in favor of Quincy Mutual Fire Insurance Company, and the Lititz Mutual Insurance Company has perfected its appeal from the judgment against it, and the cause is here on transfer from the Houston Court.

We affirm the judgment of the trial court.

■ Our Supreme Court, on June 23rd past, in Hardware Dealers Mutual Insurance Company v. Berglund, Tex., 393 S.W. 2d 309 and Paulson, et ux., v. Fire Insurance Exchange, Tex., 393 S.W.2d 316, has announced the rule that we think is applicable and controlling to the disposition of this cause of action: "In Hardware Dealers Mutual Insurance Company v. Berglund, * * * we held that although it could be said that the hurricane caused the loss, yet, nevertheless the plaintiffs could not recover unless they were able to establish that the loss did not come within the exclusionary clause relating to 'tidal wave, high water, or overflow, whether driven by wind or not.' * * * In McDonald v. New York Central Mutual Fire Insurance Company, Tex., 380 S.W.2d 545, * * * we held that a plaintiff could recover under an insurance policy similar to the one now before us by showing that the damage to his property was occasioned by the winds of the hurricane rather than by the high waters accompanying the storm. In the Berglund case above mentioned the trial judge submitted the case to the jury upon the theory that the evidence disclosed that a portion of Berglund's damage was not caused by an excluded peril, namely, 'tidal wave, high water or overflow, whether driven by wind or not.'

$*$ $*$ $*$ $*$ $*$ $*$

"However, there was no evidence from eye witnesses as to damage done to the plaintiffs' property by wind action alone, nor did anyone attempt to estimate the proportionate part of the damage caused by wind action, independent of all other causes, considering such factors as the force of the winds and the type of construction represented by plaintiffs' building. *It is essential that the insured produce evidence which will afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the* insurance policy." (emphasis added).

Since we are of the view that the foregoing rule announced by the Supreme Court is controlling here we will attempt to examine only that portion of the record which we believe is applicable under the above rule.

First of all, the Lititz Mutual Insurance Company plead the following exclusions:

"This policy does not insure against * * * C. Loss by earthquake; surface waters, flood waters, waves, tide

or tidal wave, high water, or overflow of streams or bodies of water, all whether driven by wind or not, * *."

Quincy Mutual Fire Insurance Company specifically plead:

"Unless specifically named hereon, this company shall not be liable for loss * * * caused by * * * snowstorm, tidal wave, high water, or overflow, whether driven by wind or not; nor for any loss caused by rain, whether driven by wind or not, unless the wind or hail shall first make an opening in the walls or roof of the described building, and shall then be liable only for loss to the interior of the building, or the insured property therein, caused immediately by rain entering the building through such opening."

It is the position of each of the insurance companies that the Deans did not carry their burden under the foregoing provisions of the policies sued upon and that under the rule announced in the Berglund and Paulson cases that judgment should be rendered for each of the insurance companies. First of all, we are of the view that the Deans' failure to sustain their burden of proof that an insured peril caused the damage to the household goods and the excluded causes did not cause the damage, that there is no error in the judgment in favor of Quincy Mutual Fire Insurance Company.

On direct-examination, Dr. Blumberg had testified that 90% of damage to the residence was caused by wind only, and testified on cross-examination in part:

"Q. * * * Let me take up one thing before we adjourn for lunch, Doctor:

Can you honestly say that the same 90% of your damage estimate applies to the furniture as it does to the house?

A. No, sir.

Q. Certainly we have necessarily got to agree that there was a substantial loss by water, the high tide, to the contents of Mr. and Mrs. Deans' house, do we not?

A. I am not sure what you mean by 'substantial', Mr. Cousins.

Q. Well, even if the water was only two feet deep in their home, it was causing damage to the contents of it?

A. Yes, sir."

No other testimony appears in the record that is in conflict with Dr. Blumberg's testimony with reference to the damage percentage wise to the plaintiffs' personal property. For this reason it will not be necessary to discuss any further any of the testimony relating to damage sustained to the household goods.

We will now give our attention to the testimony relating to damage sustained by the Deans to their home. Testimony was tendered to the effect that this home was a one story building and plaintiffs had been living in it for some several years prior to the time that Carla struck.

Mrs. Barr, who lives in the area about 800 feet from the Dean home, testified to the effect that the Barr home was constructed with an attic bedroom with windows facing both sides, and that she and her husband, son and a young friend remained in their home from September 9th to September 12, 1961; that on Monday morning and afternoon the windows in their home began to blow out; that she knew the sounds of hurricane winds, and that during the time the O'Sullivans' house, 200 feet from the Barr place, was plainly visible for a while, but that a little later it had disappeared; that the roaring noises heard in the Carla storm were in effect similar to those she had heard in West Texas when she was 150 feet from a tornado; that after the storm had subsided, she inspected the O'Sullivan home, which

was a short distance from the Dean place, and that the only thing left was the foundation. She testified to the effect that she heard three roaring noises, one about 6:00 P.M., on Monday, September 11th, and the next about 11:30 P.M., on that date, and the next about 2:30 A.M., on the morning of Tuesday, the 12th; that the noises were going northwest over her house coming from the southeast. With reference to the roaring noises that passed over her house between 2:30 and 3:00 on the morning of the 12th, Mrs. Barr testified specifically:

"Q. Now, Mrs. Barr, in each of those particular occurrences of roaring noises and the phenomena that you have described for us, did you not experience any change in your physiological or body feelings or such as that? If you had any physical reaction describe it for us please?

A. It was hard for me to breathe.

Q. You remember that?

A. Very clearly.

Q. Did that occur or not in each of those occurrences when you heard that roaring noise?

A. It was most marked about the time of the noise at around 2:30; I felt it to some extent also at 11:00, but at 2:00 something, whatever would have been, well, I was frightened because it was hard for me to get my breath.

Q. Did you experience any other type of physical change or condition about you that you recognized at that time?

A. Well, everybody's voice seemed very far away. Even the ones who were, we were just huddled together and their voices seemed very, very far away.

Q. How long did this condition that you personally sensed, or difficulty of breathing and the vacuum type area where the voices were far away, how long did that last?

A. Well, I don't know; it must have lasted some more than eight minutes, perhaps.

Q. Did anything occur to your house itself; did any condition occur there that you noticed different from the way this hurricane winds were affecting it?

A. Well, the roof seemed about just to come in. We were sitting under the crest of the roof and it seemed as if it were just going to close in on the spot where we were.

Q. What occasioned you to feel like you wanted to go out on the roof?

A. Well, so I could get more fresh air and the fact that I did not want to be crushed because I had a feeling this roof was going to close in on us."

Mrs. Brieden testified to the effect that she had been in tornadoes before in Louisiana, and that she lived in the particular area where the Deans lived, and she heard a roaring over her house about dark on September 11th; she said her house was not more than a mile from the Dean home, and that her house was not subject to the invasion of any ocean water, but when the roaring started the rain started pouring in though the walls and roof of her home; that the house breathed in and out, and the walls moved in and out during the roaring noise of the passing of the tornado; that the roaring sound of the winds during the passing of the tornado were different from the Carla winds preceding and following the roaring noise; that the noise seemed to be traveling in a direction across Burnett Bay between her house and the ship channel; that this would place it over Brownwood Peninsula where the Deans lived; that the treetops around her place

were twisted out and the water was pouring down from and through the roof of their home and shaking it.

Mrs. Underwood, who lived directly across the street from the Deans, testified she had lived at that location some 15 to 17 years and that she and her husband had a nursery on part of their land across the street from the Deans; that they had a large stock (value about $35,000.00); that part of the nursery had a lot of canned stock; that is they used cans, formerly lube cans, quart cans, gallons, etc., to plant and carry mobile young nursery stock in, such as camellias and other shrubs; that the bulk of the can stock was under an oak tree, not over 200 feet from the Dean house, and that these cans were sitting on the ground. She testified in part (after being handed plaintiffs' exhibit 6):

"A. This is the can stock that is here. These are gallon cans right in here * * * and here are gallon cans * * *. This * * * is a 2½ gallon and a 5 gallon can size.

Q. I see.

A. And they all consist of azaleas, camellias and * * *?

Q. Now, this question, and I want you to be very careful in answering, please. Had any of those cans in any way been changed or altered or disturbed by you or anyone after Hurricane Carla?

A. No.

Q. Tell the jury whether or not these cans appearing in plaintiffs' No. 6, are exactly as they appeared after the passage of Hurricane Carla and any ocean waters that came in over your planted area?

A. These are exactly the way they were before and after Hurricane Carla.

Q. Well, how much water did you have in your house, please mam, if you recall?

A. Five feet.

Q. Alright, had any water that came across there, were any of these cans knocked down or beaten up, or washed away in any way?

A. No, this is the miracle that we contend.

Q. What was done to your house?

A. 85% destroyed, we had a brick home.

* * * * * *

Q. Tell us what the condition of the bird bath was and where it was located when you got back and your house was 85% disappeared and destroyed?

A. It was still there in its exact formation.

Q. You mean it hadn't toppled over or been torn down?

A. No, sir it had withstood all the elements that had come.

* * * * * *

Q. Alright, do I understand you to say then, that as far as the lower part of your house is concerned that the brick veneer had fallen out or appeared to have?

A. As I so stated, that it was as if it, I am using it loosely, had exploded on the inside.

Q. Well, the point I am making is * * * it had fallen out?

A. Yes, it was out."

Mrs. Wright, who lived in the area of the Deans' home, testified to the effect that she stayed in the Burnett school on Northshore Bayway Drive during the hurricane; that she went there on Sunday and stayed until Tuesday night. She testified to the

effect that about 2:30 on the morning of Tuesday, September 12th, she heard a roaring noise and it sounded like hundreds of locomotives; that the noise was different from the hurricane winds that she had been hearing, and that the roaring noise and winds accompanying it came from the southeast and during the passage the rain came through the school building but the roof did not blow off; that the wind lasted only a few seconds.

Mr. Hutto, a restaurant owner, who lived in this particular area said his home was on South Burnett Drive, Lakewood Addition, Baytown; that his home is on Burnett Bay immediately across the Brownwood Peninsula where the Dean house is located; that he was at his home at noon on Monday, September 11th, and had water in his house at noon, less than 24 inches; that he came back at 4:30 and conditions were about the same; that he could see all of Brownwood Peninsula where the Dean house was located, and that at about 5:30 he could see water spouts, in fact, three water spouts, just a short distance from the Dean house; that the water spouts were going in a westerly direction moving from easterly or southeasterly direction, and that they disappeared up the Houston ship channel; that the water spouts passed by in less than thirty minutes; that while the water spouts were passing it caused a sudden influx of ocean waters, and while this was going on a large tree in his yard was blown across the driveway.

Mrs. Dean testified as to the appearance of their home after the storm. She stated the garage normally faced west but when they returned the garage roof was on the ground and facing in the opposite direction; facing in a direction from which the southeasterly winds coming across the water sections came from; that the garage building was fastened to the concrete beams by plates and bolts; that items that had been in the kitchen were found in other parts of the house and the furniture all broken and crushed and torn apart; that the nylon curtains had been wrapped around a sash.

Plaintiff Dean, with reference to exhibit 20 testified in part:

"Q. Alright, sir, now I want you to hold up that so that I can, you see this door opening that appears there on plaintiffs' 20?

A. Yes, sir.

Q. Tell us whether that was your front door, or not?

A. Yes, sir. It was.

Q. I want you to tell us and please give it the most careful recollection, how that door was hung? As to whether it was swung in or swung out?

A. The door swung in.

Q. How was the jam or frame assembly of that door connected to the general structure?

A. How was it?

Q. Yes, how was it built or connected to the studding?

A. It was nailed securely * * *.

Q. Alright, let's get back to it. Now, did you happen to observe that particular door where the door, and the frame and the jam had been connected to the general structure, and can you determine whether that framing was still there?

A. Yes, sir. I observed it.

Q. Well, was the door frame and jam still there when you first came back?

A. No, sir, it was not.

Q. I see. Well, we will have some detail examination of that a little later, but I wanted to get your recollection when you first went in there, whether that door in the framing as it appeared there was just that way.

A. Just exactly like the picture shows it."

With reference to exhibit 32 concerning a tree he testified in part:

"Q. And where is that part or portion? If you will hold it up and indicate it to the jury.

A. Right here (indicating). Right in the center, right here where my finger is.

Q. Now, what has been there in your knowledge and and above that prior to Hurricane Carla?

A. Well, it had that top of the tree, the actual top I mean, and it extended up much higher.

Q. * * * About how much higher did the top extend above the area shown here in plaintiffs' No. 32 as being absent?

A. It would be a rough estimate, but I would say between six, at least six feet and possibly over.

Q. How much diameter do you recall was in this central limb or the trunk of the tree that appears to be broken off or twisted off or missing?

A. Roughly, 4 inches."

He further testified to the effect that the interior of his home was damaged; that the walls were pushed out or inward and so forth; that the bathroom was located between two bedrooms, and that the pictures shown in the exhibits with reference to the damage to the bathroom were taken in January 1964, which showed the venetian blinds wrapped around the bathroom curtain in a manner they were found immediately after the storm. Many pictures were introduced by plaintiffs showing Deans' home after the storm. It had not been reopened nor occupied since Hurricane Carla and these pictures, together with the testimony of the witnesses, and the many exhibits, were for the jury to draw their own reasonable inferences and deductions as to the causation of damages sustained by the Deans. With reference to the windows he said that after Carla the glass in the window panels was broken and on the outside of the house rather than inside.

Dr. Randolph Blumberg testified to the effect that he was a graduate Ph. D. of A & M College; that he held a Bachelor of Science degree in electrical engineering, and that he had worked in design engineering for airplane wings and forms; that his Ph. D. came about from a fellowship in engineering and oceanography, which included meteorology; that he had been very active in analyzing wave, wind and wave forces on offshore and inland structures; that he had worked with the Weather Bureau on National Hurricane Research projects; that he had prepared himself as a specialty on Hurricanes since 1955, when he worked for Humble Oil and Refining Company, studying inland wind storms, tornadoes and cyclones, as well as hurricanes. He testified in part:

"Q. * * * With respect to weather phenomenae, tornadoes or hurricanes, each has its own trademark or stamp or tell tale it leaves in the character of damages that follow it. Is that or not well known to the scientist and engineers in oceanography and meteorology? A. Yes, sir, except that if I may make this exception. A hurricane is so much broader and larger scale weather phenomenon that it has frequently tornadoes in it, which was the case of Carla."

Dr. Blumberg testified to the effect that the roof of the Dean Home was out of plumb vertically; that he believed the house before the storm was more than ordinarily airtight by the way it was constructed; that he noticed the corners were damaged by racking type of damage; that the large bolts were sheared off and the walls were pressed outward. With reference to his opinion as to what caused the exterior wall of the den to shear the bolts and to hang

from the upper attachment and to hang outward, he testified in part:

"Q.  I caution you please in giving that opinion to give us the reasons for that opinion, the physical conditions you attach importance to in reaching that opinion.

A.  Yes, sir.  It is my opinion that the walls failed—this particular wall—section failed as a result of a pressure difference between the—inside the house and outside of the house at the point—at the time of failure, and this pressure difference gave an unbalanced force which acted from the inside of the house to the outside of the house.  It is somewhat analogous to taking a paper bag and filling it with air and suddenly snapping it. · It gives a loud retort and explodes.  Similarly if you reduce the pressure base of something like a tornado—or if a tornado is here reducing the pressure on the outside wall of this home, it can cause an unbalanced force to exist from the inside out which can measure up to about 170 pounds per square foot in not a very major tornado.  This particular unbalanced force—a force substantially less than this—would be adequate to cause these particular bottom bolts to fail and to allow it to move outward in the direction of lowest pressure or in the direction of least resistance.

* * * * * *

Q.  In that connection, Mr. Blumberg, we have two concepts being projected here.  One by the plaintiff that this property was damaged by Hurricane Carla, by the defendant that rising water going up and down in that property occasioned damage.  I want your professional opinion based upon your experience and research and knowledge whether or not you can see any evidence of rising water having occasioned any of the rupture and disturbance of that wall in the section we have been talking about?

Q.  Do you have such an opinion as to whether it did or did not have any influence?

A.  Yes, sir.  Rising water without being, without the advent of other systems, such as waves or tides or main big currents, rising water tends to balance itself in time such that the pressure on the inside and outside are nearly equal.  So in the event of rising water, there is no unbalanced force to cause any damage such as this, for simple rising water.

Q.  Now, may I query you again as to whether you have an opinion as to where that wall would have been if there had been the impact or wave action against it.  Would it have come out or gone in?

A.  It would have gone principally in because the forces in waves are primarily crest forces.  The crest forces are greater than the trough forces.  They tend to batter in, break in and tear up things in the direction of wave movement.

Q.  Well, what is the extreme significance to you of the fact that this wall has pushed outward and has sheared off the bolts in the direction of going back against the area of impact of winds?

A.  Well, the prime significance is that this is typical of tornado conditions whether or not the 170 pounds per square foot is achieved.  As I have pointed out, this is not a necessary condition at all here.  A much lower force would be able to push this out, but also there is no evidence to any significant wave action here, as either from scour—there was no scour evident and in these areas where we had substantial scour during Carla, we

still have evidence, unless these have been filled since that time. Further, there was no break in damage or destructive type forces from the principal wave direction or the direction of wave onslaught, if there were waves of any size there.

\* \* \* \* \* \*

Q. Comparable to your first opinion given us, if you develop a negative pressure on the opposite side from the impact of the wind, in hurricane winds and are on the lee-side, do you or not create an imbalance between the air pressure inside and the air pressure on the back side of the house?

A. Yes, sir. You have an imbalance, whether or not the pressure is higher in the home to begin with, you still have an imbalance due to fluid flow of the air over areas of fluid, and as it flows over the body, it causes this vacuum force, which results in a pressure on the outside.

Q. If you get reduced pressure on the outside, and have a higher pressure on the inside of a structure—

A. Well, the differential gives rise to the force which we have just mentioned here. If that pressure differential is greater, then the force is great, causing the air on the inside to want to move outside, again, as in the paper bag, when you suddenly snap it, you confine it, and the air needs to get out, and it will leave through—by making an opening through the paper sack.

Q. Well, let's get back to that, in the walls of a structure:

What does it do to the walls of a structure, if it has enough imbalance of pressure?

A. It will break the walls, forcing them in an outward direction, out away from the center of the structure.

Q. \* \* \* Tell us whether that is typical phenomena in either hurricane winds or tornado winds?

A. This is typical, yes, sir."

There was also testimony to the effect that the walls of the garage were gone, and that the garage roof remained, but that it had been twisted around to the left or in a counter-clockwise direction, and had dropped down in a distorted position. There was also testimony to the effect that there were large bolts that fastened the garage to the concrete beams, but that these bolts were twisted in counter-clockwise direction, and with reference thereto Dr. Blumberg said:

"A. Allright, this bolt you will also note is turned away from its normal straight up and down position. At this time, it is turned to the rear part of the garage structure, which existed, and it is also —you can tell by the shadow here—moved—well, that is, by observation—moved in a direction such that it was bent toward the rear part of the garage in this particular picture.

\* \* \* \* \* \*

Q. I want you to start, first, and give me your statement as to whether you do or do not have an opinion as to the position of these various bolts that you have described them, having any significance in terms in what character of weather phenomena may have passed on or around or about this area of the garage?

A. To answer your question, this particular study was made, made with considerable care, to establish whether or not there was any evidence here of any type of twisting or rotation movement of this

particular part or this particular structure. In particular, the observation was made that in each case, these bolts were, in fact, leaning in a direction which is characteristic of, or counterclockwise, characteristic of the direction of twisting which is typical of tornadoes when they take and move structures off of their paths.

\* \* \* \* \* \*

A. Well, Mr. Bryan, I believe as I mentioned a moment—started to mention a moment ago—that this particular structure was twisted counter-clockwise from its foundation beam and pickedup and laid down very closely to its original position, with the walls blown out, and also laid down, in this particular section, as you see the fore peak, or top of the roof peak, which you have given me to assume, which is the front of the house, which has been so testified, it is in effect in a counter clockwise direction; that is moved, twisted, counter-clockwise, from its normal position as described."

Dr. Blumberg further testified on cross-examination:

"Q. How in the world do you arrive at a percentage by your estimate of 90% damage by wind to this house?

A. I have arrived at this estimate by looking at the structure, determining the general features that it appeared to have heavily racked and twisted, most of the damage resulting from separations; doors physically being moved from one place to another; major sections of the wall broken out, and on this basis, I have arrived at the best estimate that I was able to make on the relative value or cost of

damages resulting from a tornado or high wind system.

Q. Your first inspection was made in January, 1964?

A. Yes, sir, that's correct."

On redirect examination Dr. Blumberg testified:

"Q. Have you or not had any occasion to observe in the restoration in some of those places, the very type of construction as appeared in the Dean place, having interior walls, having shoe-moulds, having base-plates, having the usual construction of sheetrock and such as that—have you observed any of them, where they had just—just had water rising up and down, where the repairs and cost of repairs have been made and sustained?

\* \* \* \* \* \*

A. Yes, sir.

Q. Well, in terms of what I am trying to find out, how you retionalized and got your 90% damage, whether or not those factors and actual experiences and knowledges of what kind of damage rising water alone gave or made, did you take that into consideration?

\* \* \* \* \* \*

A. Yes, sir.

Q. You did?

A. I did."

Perhaps we should state that the Lititz policy in suit contained what was designated 148-S Endorsement, which was attached to the policy and provided:

"Subject to the provisions of this form and of the policy to which this form is attached including endorsements thereon, this policy insures against all risks

of physical loss to the described dwelling * * *."

With reference to the damage of the property the witness Aylor testified to the effect that he was a local contractor and that it would cost approximately $9200.00 to repair the dwelling and the garage. He testified on cross-examination in part:

"Q. And you have made no effort whatsoever to make any distinction between the wind, on the one hand, and the combination of wind and water on the other?

A. I do recall making this statement, that some of the things that I did see, it seemed impossible that it could happen from water alone.

Q. *Yes, but that very possibly could have been a combination of the water and the wind, or it could have been the wind, is that a true statement?* (emphasis added)

A. *It could be the wind.* (emphasis added)

Q. All right, or it could be a comination, couldn't it, of the wind and water pressures, true?

A. I don't think water would take a door out—I mean, I can't see where it would take a door out in one house, against the stops, and not do it in another. Now, I made lots of appraisals in houses where every door—I mean, it had the same amount of water, most of them down there did—every door and wallboard and all was still intact, had the same amount of water.

Q. I appreciate that, but the point I make there is that it is impossible for you to tell whether that would be wind alone, water alone, or a combination of the two, isn't that a true statement?

A. It would be impossible to tell, but I can't see why it would do it in one house, the damage would be one way, and then another house—

Q. *Well, I concede that there was a wind variance in the dwellings and homes, particularly in the Brownwood area, but the point is this:* (emphasis added) As far as this Dean home is concerned—that is what we are concerned with today —the question of winds versus water versus a combination of winds and water—you have made no attempt to differentiate in your estimate of $9200.00. That is a true statement, isn't it?

A. In my estimate, no, there is no differentiation.

Q. All right, sir.

A. It is a cost to repair all of the damage that is done."

Dean testified that he had an opinion as to the value of the property immediately before it was damaged and that it was $12,750.00, and that immediately after Carla its value was $3550.00. On cross-examination he testified to the effect that the house was built in 1946 by Mr. Bishop, who was his father-in-law, and that it cost $8500.00, and that there was a room added subsequent to its original building; that the part added was a large walk-in closet, 6 x 10, and that the entire property, including the garage, was $12,500.00. He further testified in part on cross-examination:

"Q. Have you reviewed any figures here since 10:00 o'clock this morning in preparation for this testimony?

A. I was asked to refresh my memory, yes, sir.

Q. By what?

A. About what the price—the price of the house was worth before the storm and after the storm.

Q. All right, who made up those figures?

A. I had a real estate appraisal of the house.

Q. Excuse me, I am sorry, I didn't mean to interrupt you, Mr. Dean, and you used the real estate appraisal at least as a part of the basis for your opinion?

A. I used it all together as a basis of my opinion.

\*　\*　\*　\*　\*　\*

Q. Is it strictly happenstance that your opinion of value before and after is almost exactly the same as Mr. Aylor's repair estimate?

A. I don't believe I understand your question.

\*　\*　\*　\*　\*　\*

Q. Why does it happen that your estimate of value is so close to the repair estimate made by Mr. Aylor?

A. May I make a statement?

Q. I would like to have the question answered?

A. *In my own personal opinion, Mr. Cousins, the property out there at the present time is valued that value that I gave a moment ago $3550.00."* (emphasis added)

Since the jury found that a portion of the damages to the Deans' dwelling was directly caused by the forces of wind alone as distinguished from surface waters, flood waters, waves, tide, high water, or overflow of streams or bodies of water, all whether driven by wind or not, and further found that the reasonable cost of repair, with material of like kind and quality and within a reasonable time, to the dwelling attributable to or caused by the forces of wind as distinguished from surface waters, flood waters, waves, tide, high water, or overflow of streams or bodies of water, all whether driven by wind or not, to be the sum of $9200.00, and since Dr. Blumberg

testified specifically in his opinion that 90% of the damage was due to wind or wind system as distinguished from damage by water, and since the trial court required a remittitur of 10% of $9200.00 on penalty of granting a new trial, the sole question here is: Does this record bring the Deans within the rule announced by the Supreme Court in the Paulson and Berglund cases? We think it does.

■ Our view of the evidence tendered in this cause, together with all the surrounding facts and circumstances with reference to what happened, gleaned from the best evidence available as to the damages to the Deans' residence sustained as a result of Hurricane Carla by wind alone, and the testimony of Dr. Blumberg as an expert, under all the surrounding facts and circumstances shown in this record, together with the investigation that he made of the building after the storm, has probative force, and that it is sufficient to sustain Dr. Blumberg's testimony to the effect that 90% of the damage to the Dean residence was the result of the wind alone, and is sufficient in connection with all of the other testimony tendered that 90% of the damage sustained by the Deans to their residence was the result of the wind alone as distinguished from the damage sustained by water.

In Biggers v. Continental Bus System, Inc., 157 Tex. 351, 303 S.W.2d 359, pt. (1), page 363, our Supreme Court said:

"The judgment of the Court of Civil Appeals in favor of Continental must be reversed if there is in the record before us evidence of probative value which, with the reasonable inferences therefrom, will support any one of the findings of proximate cause. Hall v. Medical Bldg. of Houston, 151 Tex. 425, 251 S.W.2d 497, 498. Moreover, we must approach a determination of the question in the light of our former admonition regarding questions of 'no evidence' that 'Appellate courts are without authority to set aside jury ver-

dicts, particularly on questions of proximate cause in damage suits, upon conflicting facts—the undisputed facts must be ample and clear, and the circumstances most exceptional to justify such action.' Liberty Film Lines v. Porter, 136 Tex. 49, 146 S.W.2d 982, 983."

■ In Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, our Supreme Court made the following pronouncement:

" * * * the action of the trial court in granting judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon. * * *

" 'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' "

■ In Miller v. Fleming, 149 Tex. 368, 233 S.W.2d 571, (Sp.Ct.) we find the following pronouncement:

" 'The law only demands the best proof of the transaction that it is susceptible of, and when that is produced then it becomes a question whether or not its probative force is such as to establish its existence'. The rule by which presumptions of fact are made admissible emanates from the evidence. The application of the rule depends upon the character of the evidence, and its application is liberalized when the evidence is circumstantial."

■ In Olds v. Traylor, Tex.Civ.App. 180 S.W.2d 511, (writ ref.) this court said:

"Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.' "

Our Supreme Court has not changed or modified the rule in the foregoing cases.

■ We think the foregoing pronouncements of our Supreme Court, when applied to the testimony tendered in this cause, together with all the surrounding facts and circumstances shown by the record, are sufficient to afford a reasonable basis for establishing a reasonable amount of damage or proportionate part of damage caused by the wind alone to the Deans' dwelling and that such coverage is within the policy. We are of the further view that the verdict in favor of plaintiffs as to the damage to the residence is not against the great weight and preponderance of the evidence, and that it is not unjust. Therefore, each of the points of the Lititz Mutual Insurance Company assailing the judgment entered against it is overruled. Likewise, Deans' counter-points are overruled. Each of the points tendered by the Deans assailing the judgment entered in favor of Quincy Mutual Fire Insurance Company is likewise overruled.

Accordingly, the judgment of the trial court is affirmed.