Fred Allan COLLIER, Sr., et ux., Appellants,

v.

HILL & HILL EXTERMINATORS et al.,
Appellees.

No. 13344.

Court of Civil Appeals of Texas.

Houston.

Feb. 5, 1959.

Rehearing Denied March 12, 1959.

Blades, Crain, Slater & Winters, W. H. Blades, Houston, for appellants.

Fulbright, Crooker, Freeman, Bates & Jaworski, Charles M. Haden, Houston, for appellees.

BELL, Chief Justice.

Appellants sued appellees for damages allegedly resulting to them from the death of their daughter who at the time of her death was two years and eight months old. They sued both in their individual capacities and for the benefit of all beneficiaries to the estate of their daughter Lori Alice under the Death Statute, Vernon's Ann.Civ.St. art. 4671.

The basis of the suit was the alleged negligence of appellees in using phosphorus poison in connection with their efforts to exterminate roaches and silver fish in the home of appellants. It was alleged that appellees were negligent in the manner in

which the poison was applied; that the child ate some of the poison and this caused her death.

The appellees denied the allegation and affirmatively pled that the death of the child was the result of contributory negligence on the part of the appellants, the negligence consisting in their failure to prevent the child from getting into the poison when they knew it had been used and knew the places it had been applied.

The case was submitted to the jury on special issues. In response to such issue the jury found as follows:

1. That Lori Alice Collier ate some of the phosphorus poison used by appellees in the home and garage of appellants.

2. That she died as a result of eating such poison.

3. That the manner in which the phosphorus paste was applied by appellees in the home and garage of appellants was a negligent one.

4. That this negligence was a proximate cause of the death of Lori Alice.

5. That the appellants knew, or should have known, that the phosphorus placed in the home and garage would endanger the health and life of the child if it should be consumed by her.

6. That appellants Fred Allan Collier "and/or" Murnelle Cox Collier failed to exercise that degree of care that would have been exercised by prudent persons in the exercise of ordinary care, under the same or similar circumstances, in failing to keep their child away from the phosphorus.

7. This failure was a proximate cause of the child's death.

8. The child's death was not the result of an unavoidable accident.

9. The damages were assessed at $8,500.

Appellants filed their motion asking the Court to set aside the answers of the jury to Special Issues Nos. 5, 6 and 7, which convicted appellants of contributory negligence because there was no evidence to support such answers and, after setting aside such answers, to enter judgment for appellants. In addition to the contention that such issues be set aside because there is no evidence to support the jury's answers, the appellants contend that the answer to Special Issue No. 6 is a nullity because it assumes appellants failed and there is no finding that they failed, and also since the Issue inquired as to whether Mr. "and/or" Mrs. Collier failed to exercise due care, it cannot be said whether the jury answered Mr. and Mrs. Collier failed, or that Mr. Collier failed, or Mrs. Collier failed.

Appellees filed a motion for judgment on the verdict.

The Court overruled appellant's motion for judgment on the verdict after setting aside the jury's answers to Special Issues Nos. 5, 6 and 7, and granted appellees' motion and entered judgment that appellants take nothing.

These are appellants' complaints which they assert entitle them to a reversal and rendition of judgment in their favor, or at least to a reversal of the case for retrial:

1. There is no jury finding that appellants failed to use due care in keeping their child from consuming the poison but such fact is assumed in Special Issue No. 6.

2. The form of Special Issue No. 6, reading:

"Do you find from a preponderance of the evidence that Fred Allan Collier and/or Murnelle Cox Collier failed to exercise that degree of care as would have been exercised by reasonably prudent persons in the exercise of ordinary care, under the same or similar circumstances, in failing to keep their child away from a substance containing phosphorus?"

is duplicitous and is in such form that the jury's answer in fact answers nothing.

3. There is no evidence supporting the jury's answers to Special Issues Nos. 5, 6 and 7 and the Trial Court erred in not setting aside such answers and entering judgment for them on a basis of the jury's answers to Special Issues 1, 2, 3, 4 and 8, which latter Issues convicted appellees of negligence, which was a proximate cause of the child's death and assessed damages.

Appellees contend this Court cannot consider the complaint that Special Issue No. 6 was duplicitous because there was no objection to the form of the Issue. They also contend we cannot consider the complaint that the Trial Court refused to set aside the jury's answers to Special Issues Nos. 5, 6 and 7, because appellants made no objection to the submission of such Issues.

■ Appellants cannot complain that Special Issue No. 6 was duplicitous because they made no objection to the Issue. Any such complaint they might have had was waived by the failure to object to the form of the Issue. Rule 274, Texas Rules of Civil Procedure.

■ The complaint that Issue No. 6 assumed that the Colliers or one of them failed to keep the child from consuming the poison is untenable for two reasons. The evidence conclusively establishes that they or one of them did fail because she consumed some of the poison. There could, it would seem, be no question about this. The only question would be as to whether such act was negligence. Where a fact is undisputed it is unnecessary to obtain an answer from the jury. Only disputed matters are submitted to that body for solution. Too, whether the Colliers or one of them failed is only one element of a ground of defense and where a ground of recovery or defense consists of more than one element and one or more of such elements are submitted and one or more are omitted, and there is no objection to the charge because of such omission or no request to include such element, it will be presumed that such omitted element was found by the Court in a manner so as to support the judgment, if there be evidence in the record to support such a presumed finding. Rule 279, T.R.C.P.

■ Appellees' contention that we cannot consider appellants' complaint that the Trial Court erred in not setting aside the jury's answers to Special Issues Nos. 5, 6 and 7 on the ground that there was no evidence to support such Issues, because appellants did not object to the submission of such issues, is without merit. The last sentence of Rule 279, T.R.C.P., provides: "A claim that the evidence was insufficient to warrant the submission of any issue may be made for the first time after verdict, regardless of whether the submission of such issue was requested by the complaining party."

■ Rule 301, T.R.C.P., authorizes motions for judgment notwithstanding the verdict and motions to disregard the jury's answers to certain issues and after disregarding such answers to render judgment for the movant on the remaining portion of the verdict. In case of a motion to disregard certain answers (as distinguished from a motion to disregard the whole verdict), the test as to whether such answers should be disregarded is whether there is any evidence to support the answers.

■ These two rules must be construed together and when so construed they authorize such complaint to be made for the first time after verdict. Of course, such complaint could not be made for the first time on appeal. Myers v. Crenshaw, Tex. Com.App., 134 Tex. 500, 137 S.W.2d 7; Halford v. Perry, Tex.Civ.App., 310 S.W. 2d 745, no writ history; Myers v. Minnick, Tex.Civ.App., 187 S.W.2d 941, no writ history.

We will, therefore, consider appellants' complaint on appeal that the Trial Court erred in not disregarding the jury's answers to Issues 5, 6 and 7.

Appellees have a cross-point in which they assert that the trial court erred in not granting their motion for an instructed

verdict. They say they were entitled to this because there was no showing of negligence on the part of their agent, nor was there any evidence establishing that the phosphorus found in the child's system was the phosphorus which had been applied by their agent.

These two questions require a review of the testimony.

Mr. Collier was the first witness. He testified that they employed appellees to exterminate roaches and silver fish from their home here in Houston. The home is located at 3223 Castlewood. On June 16, 1956, Harry West, agent of appellees, came to their home pursuant to previous arrangements made with appellees to perform this service. This day was a Saturday. Mr. West told Mrs. Collier to cover the dishes with a cloth and after the work had been done to rinse the dishes. Mr. West used some kind of spray, spraying the baseboards in the house. After finishing with this, Mr. West began spreading a paste. The paste was put in inverted cones in some places. These cones were placed under the stove, washing machine, refrigerator and bath tub. Inside the bathroom was a clothes hamper for soiled clothing. Inside of this hamper was an opening into the plumbing. The opening was kept closed by a wooden covering. The covering was held in place with nails. Mr. Collier, at Mr. West's request, got a hammer and adjusted the nails sufficiently to allow the removal of the covering. Inside of this recess for the plumbing fixtures Mr. West put some of the phosphorus paste. The covering was later found in place, though it was not nailed back. After the child's death inspection was made of this and the covering was in place. No phosphorus paste was found accessible in the clothes hamper or around the opening into the plumbing. The paste in the cones placed under the appliances would not be seen by anyone unless they looked for them. It would be very difficult to reach them after discovery. They were relatively inaccessible. Mr. West also spread the paste on the back of all drawers. This was not on the inside of the drawers, where things would be kept, but outside on the back where the back side would fit against the back of the frame into which the drawers fit. The phosphorus paste thus spread could be reached only by completely removing a drawer. There must have been about 40 drawers on which the paste was smeared. After the paste had been thus placed in the house, Mr. West put some of the paste on the "2 X 4" studs in the garage. Again small smears of the paste were used. They were placed 7½ to 8 feet upon the studs. In the back of the garage a shelf about 4 or 4½ feet above the floor had been built. It was built high so that the hood of the car could go under it. Mr. West put some of the paste on this and on the studs. Mr. Collier knew where the paste had been placed by Mr. West. Mr. Collier knew this paste was poisonous. Too, chlordane powder was scattered in the garage. After Mr. West left, Mrs. Collier washed the dishes. She cleaned and swept the floors. That afternoon the Colliers and their children (they had two other children) went to Giddings where they visited until Sunday evening with Mr. Collier's mother and father. They returned Sunday evening. During the next week Mr. Collier went about his work at W. K. M. Company. He usually left home for work about 7:30 in the morning and remained away until after 5 p. m. Lori Alice from time to time rode her tricycle up the driveway and into the garage. During the week following the application of the phosphorus the Colliers went on the following Saturday to a Little League baseball game. On Sunday evening they went to Mr. Collier's brother's. Neither at the mother's and father's nor the brother's house was there shown to be any phosphorus that the little girl could reach. In fact, Mr. Collier affirmatively testified he knew of none. About 2 o'clock a. m. on Monday, June 25, 1956, the little child woke up and seemed restless. She was given water and aspirin and went back to sleep. During the daytime of that day

she was taken to the doctor who was unable to find the source of her trouble. She did not appear seriously ill. Later she developed some fever. Tuesday, after Mr. Collier had gone to work, the child began having convulsions and was from such time until her death unconscious. The doctor was called and the child was taken to the hospital. She died shortly after her arrival. An autopsy was later performed and it was determined she died from phosphorus poisoning. Mr. Collier testified he did not know where she got the poison. He did not think it was from the recess in the clothes hamper where the bathroom plumbing was located. After the child's death, he looked over the premises thoroughly and could find no poison on the floors of the house, the garage, or the driveway. The cones with the paste which had been placed under certain appliances had not been disturbed. He looked at the other smears of paste and they did not appear to be disturbed. The paste that had been placed on the studs in the garage had in many places run down from 1 to 2 feet.

Mrs. Collier testified in substance, as did Mr. Collier. We will note only such of her testimony as covers facts not stated by Mr. Collier. During the day she, of course, was at home. She knew where the child was at all times though she was not physically present with her each moment. The child rode the tricycle in the garage. It was during hot weather and it was cooler in the garage where it was shady. When they were at the baseball game she knew where the child was at all times. The child had never taken a drawer completely out, though the child would pull drawers partially out to get her clothes. She does not know where the child obtained the poison. There had never been any phosphorus in their home before that put there by appellees. She at one time purchased some pellets to eradicate roaches, over 3 years before June, 1956, but they contained boric acid. It was not effective.

When Mr. West started to leave she asked him if he guaranteed the cups or cones were in safe places and he assured her they were. During the week she probably visited with her neighbor, Mrs. Smith. She did not know of Mrs. Smith having any exterminating work done recently. Underneath the shelf in the garage on the 2 X 4 studs where the phosphorus had run down there were places easily within the reach of the child. It had run down as much as 6 inches to a foot. Mrs. Collier took her child with her to the grocery store where they have phosphorus preparations for use in killing roaches. On Monday after her return from Giddings, Mrs. Collier swept and mopped the floors in the house. She saw no particles of paste on the floor.

Mrs. Smith, the neighbor, stated Mrs. Collier and the child probably visited her during the week. She kept no phosphorus in the house. In September of 1955 she had her house fogged. Her next door neighbor had the same thing done and the same company did it. No phosphorus was used in either case, so far as she knew.

Mr. Harry West testified substantially as did the Colliers as to the places and manner of placing the phosphorus. He denied, however, he put any phosphorus on the bottom of the shelf in the garage. He put the paste 7 or 7½ feet high on the studs in the garage. The spray he used in the house was not poisonous nor was the chlordane. The use of phosphorus is an approved method for exterminating roaches. The paste, other than that put in the cones, was spread paper-thin on the studs and the drawers to the furniture. They varied in size from a dime to a quarter. Mr. Collier followed him around while he was doing his work and saw where he applied the phosphorus paste. He told Mr. and Mrs. Collier it was phosphorus and poisonous. He applied the paste in the usual manner. He did not drop any of it on the floors. When it is hot this phosphorus paste will run.

We will not detail each witness' testimony but will summarize.

An autopsy was performed on the child and three white pellets were removed from

her system. On test they were found to contain phosphorus. Samples from the garage were tested and of course showed phosphorus. The percentage of phosphorus in the pellets was higher than that from the samples. However, the tests on the samples were made over a year later. The difference is explained by the chemist by the difference in time of the tests. There is no showing that the pellets were the medium by which the phosphorus was introduced into the system. No analysis was made to determine what other substance was in the pellet except tests that precluded other poisons. The liver and the brain of the child showed damage characteristic of that caused by poison.

Several people testified, showing the use of phosphorus was an approved method for exterminating roaches. We deem it not material to notice it further because the complaint made by appellants was that appellees' negligence lay in the manner in which the phosphorus was applied.

The doctor testified the cause of death was phosphorus poison.

We have, of course, abbreviated the testimony. There is really little dispute in the testimony. The differences are with regard to the facts established by the testimony.

■ We have concluded that the answers of the jury, finding the Colliers guilty of negligence in failing to keep the child away from the phosphorus, are without support in the evidence.

The parents, of course, were under a duty to use due care to prevent the child from getting the poison. They knew where the poison was. They knew how it was applied. They had been told by Mr. West, the agent of appellees, that it was in inaccessible places. They, of course, knowing where the poison had been placed, could and should judge for themselves. The smears of paste on the back of the drawers or on the inside back of the frame where the drawers fit were certainly inaccessible unless a drawer should be taken completely out. However, their experience with their child evidenced no activity by her which would lead them to believe she would completely remove a drawer. No evidence suggests she did. The cones containing poison which were placed under certain appliances were relatively inaccessible. Nothing is suggested that the child would likely come in contact with them. Mr. West assured the parents they were inaccessible. Too, they were found to be undisturbed after the child's death. The poison placed inside the area for plumbing was inaccessible certainly to a child of this age. The area was closed off from the clothes hamper. Mrs. Collier did as Mr. West directed, that is, she washed the dishes; she cleaned and mopped the floors in the house; she cleaned the shelves of dead insects. No poison was seen to have dropped anywhere on the garage floor or driveway. The poison had been placed on the studs in the garage 7 to 7½ feet high except it was placed about 4 feet high on the studs connected to the shelf built in the garage. Even placed there it was inaccessible to the child, unless she should climb up on something. There is no suggestion in the record that there was anything available to her upon which she could climb. There is no suggestion that she was accustomed to climbing. With these facts in mind, there was nothing to indicate to the parents that the child would likely come in contact with the poison. The father was at work each day. The mother knew at all times where the child was though she was not with her at all times. There is no legal requirement that she be with her at all times. The parents did not forbid the child's playing in the garage. There is nothing to indicate she would be endangered from playing there. There would have been no danger had not the phosphorus applied to the studs in the garage under the shelf run to a point where it was accessible to the child. There is absolutely no showing that the parents knew the phosphorus paste would run when it got hot and there is no suggestion that they knew it had run until after the child's death. They had

been assured by Mr. West that it had been placed in inaccessible places and it had, but it became accessible by reason of its running down the studs at the back of the garage. We feel the evidence precludes every reasonable hypothesis except that the child got the poison from the studs under the shelf in the garage.

We have read all cases cited by appellees and do not consider them controlling.

In Baker v. Dallas Hotel Co., 5 Cir., 73 F.2d 825, where the small child fell through a window that had a defective latch, the Court held a jury question was presented as to the parents' negligence because it was well known that many children had fallen through insecurely latched screens. However, the Court said the duty of the parents to watch their children must be viewed in the light of all demands made at the time. In the case before us the parents had affirmative assurance from Mr. West that the poison was in safe places; they observed that as applied by Mr. West it was in safe places, and there is no evidence showing they knew or had reason to know the paste would run down the studs so as to become accessible.

In Blossom Oil & Cotton Company v. Poteet, 104 Tex. 230, 136 S.W. 432, 35 L. R.A., N.S., 449, the Poteet child was injured at the gin where her father worked. The only liability on the part of the defendant under the facts of the case could consist in a breach of duty which the father owed the defendant. The defendant would be liable, if at all, only by reason of the father's conduct. So if his conduct breached a duty he owned the defendant, the same act would be negligent as to him. He could not profit by his own wrong.

The same appraisal is to be made of the case of Magnolia Petroleum Company v. Porter, Tex.Civ.App., 22 S.W.2d 695. There children of Porter were drowned in a lake on property operated by the defendant. As an employee of the defendant, it was his duty to keep children out of the lake. To establish liability on the part of the company, Porter had to rely on a breach of duty which he owed as a company employee. If it was negligence as to it, it was negligent conduct by him and he was not allowed to profit by his own wrong.

In Houston City St. R. Co. v. Dillon, 3 Tex.Civ.App. 303, 22 S.W. 1066, a small child had been killed when it went onto the tracks of the defendant. The jury found the parents were not guilty of negligence in letting the child get upon the tracks. The appellant contended the parents were guilty of contributory negligence as a matter of law. The Court held, however, where the proof showed the parents had forbidden the child to go outside of the house unless attended by a nurse or their 8 year old child; did not know the child had previously been on the tracks and the child, unknown to the mother, had gotten out of the house during the brief time the older child had gone to the store and while the mother was attending to boarders who lived at the house; and the parents knew if she got out into the street she would be in danger, there was a fact question.

In our case the parents had every assurance the poison was inaccessible and it was until some of it melted and ran down the studs in the garage.

Appellees contend that the Trial Court should have granted their motion for an instructed verdict because the evidence fails to show any negligence which was a proximate cause of the child's death.

■ We have concluded there was evidence showing appellees' agent was guilty of negligence and this was the proximate cause of the child's death.

■ It will be noted the jury found from a preponderance of the evidence that appellees were guilty of negligence by reason of the manner in which the phosphorus paste was applied. Actually this was a lesser degree of care than the law imposes on appellees. Poison is a dangerous instrumentality comparable to explosives.

In using poison a person should exercise a high degree of care to protect against injury to others. The appellees' agent, Harry West, knew there were small children in the Collier home. He owed the duty to so apply it that it would be inaccessible to them and so apply it that through no characteristic of the poison would it become accessible to them. Or, if it, in the form in which it was applied, might melt and run, it was West's duty to apply it in a manner to protect against the consequences of its running or warn the Colliers of this characteristic which might make it accessible to the children, so they could protect against such.

The evidence shows that the phosphorus did run down on the studs at the back of the garage so it was accessible to the child. West knew the characteristic of phosphorus, that is, that in the form in which he applied it, it would melt and run. He took no steps to prevent mischief from this. There was, therefore, evidence that appellees were negligent in the manner in which their agent applied the phosphorus.

Appellees say that there is no evidence showing any act of appellees was the proximate cause of the child's death. They contend, and correctly so, that proximate cause may not be presumed. They contend the evidence gives rise to more than one inference and any one of them would absolve the defendant of liability. We are unable to agree with this contention.

Proximate cause may be established, the same as any other element of a cause of action, by circumstantial evidence. Bock v. Fellman Dry Goods Co., Tex.Com.App., 212 S.W. 635; Henry v. Publix Theatres Corp., Tex.Civ.App., 25 S. W.2d 695, error ref.; Tex.Jur., Vol. 30-B, Sec. 158. In applying the rule, it is held that if a cause is shown that might produce an event and it being shown that an event of that particular character did occur, it may be inferred that the known possibility produced the result. Plaintiff is not required to exclude an appreciable chance that the event might have occurred in some other way. Expressed otherwise, a conclusion of causal connection may be inferred by a balance of probabilities. Bock v. Fellman Dry Goods Co., supra.

There is no contention here that there is an absence of the element of foreseeability. There could be no question but that it should be foreseen that in hot weather the phosphorus paste would run down the studs and become accessible to the children who were known to be in the Collier home and who would, in the normal course of events, be playing in the garage.

The real contention here is that there is the absence of evidence to show causation. Upon careful consideration of the evidence we have concluded that such evidence circumstantially establishes the child got the poison from the studs in the back of the garage where it had run down to such a height as to be accessible to her.

The evidence shows that during the days of the week preceding her death the child played in the garage. It further shows that very shortly after her death it was discovered that the phosphorus had run down on the studs in places to be within her reach. The evidence further shows she obtained phosphorus from some source and consumed it because phosphorus poisoning was the cause of her death. It is true it is not shown by direct evidence that this was the source. However, we feel that a balancing of the probabilities leads to the conclusion that this was the source. In any event, it is sufficient to have required that the issue be submitted to the jury as it was.

Appellees seek to have us say that it may be equally inferred that there were other sources where she got the poison. We think otherwise. First, appellees say she could have gotten it when on June 16 the family went to Giddings. Such inference is precluded by the testimony of Mr. Collier that he knew of no poison there. Too, the pathologist testified the poison would have been consumed not more than three

days before death. Next, appellees seek the inference that since the child went to a baseball game and was not with the parents every moment, she could have gotten the poison there. There is, however, no intimation in the testimony that any poison had been used on or about those premises. Again, appellees say it could have been gotten by her on Sunday evening before the onset of the child's illness when they were at Mr. Collier's brother's home. There is no intimation in the evidence that poison had been used there. The mere fact that a person visits a place is not sufficient to infer the person obtained poison there. But, appellees say the little girl went with her mother to grocery stores where preparations containing phosphorus are sold. From this there is no reasonable basis to infer she could have gotten it there. It is a matter of common knowledge that such preparations are kept in safe containers on shelves away from the general public who patronize the store.

Neither can it reasonably be said that the child got the poison at Mrs. Smith's, the neighbor's. Mrs. Smith said that in September, 1955, her house was treated for roaches and silver fish but by a process of fogging. There are, as shown by the testimony, other methods of treating homes for roaches other than by use of phosphorus. The neighbor of Mrs. Smith had her home treated in the same manner and about the same time. No phosphorus was shown to have been used at either place.

We further feel that the testimony reasonably precludes the inference that the phosphorus was gotten in any part of the house. The testimony shows the floors were swept and mopped. Too, no droppings of the paste were found on the floor of the garage or of the house. The cones under the appliances were undisturbed. In the clothes hamper and on the frame leading into the bathroom plumbing no phosphorus was found. The wooden frame closing off the place where the plumbing was, was in place. Too, it would have been difficult for a two year and eight month old child to have removed it. The paste on the back of the drawers or frame into which they fit was inaccessible unless the drawers were completely removed. There is no evidence that the child had ever completely removed the drawers. Too, an inspection of the smears placed on the drawers made after the child's death failed to disclose any disturbance of the area.

This analysis, we feel, leads to the reasonable probability that the child got the poison from the studs in the garage where the paste had run down so as to be accessible to her.

In the light of our holding, it becomes unnecessary to discuss appellants' contention that the jury's answer to Issue No. 6 was meaningless and thus a nullity.

The Trial Court erred in not granting appellants' motion to disregard the jury's answers to Issues 5, 6 and 7, and after disregarding same to render judgment for appellants.

The jury assessed appellants' damages at $8,500. It was stipulated that the expenses of last illness and in connection with her burial were $700. Therefore, the judgment of the Trial Court will be reversed and rendered in favor of appellants, that they recover of appellees the sum of $9,200 together with interest thereon at the rate of 6% per annum from April 7, 1958.

On Motion for Rehearing

Appellees, in their motion for rehearing, argue that we found them negligent in not warning appellants that in hot weather the phosphorus would melt and run. They urge this as error because there was no pleading of negligence for failure to warn and no jury finding to this effect.

There is a part of one sentence of our opinion which might give such impression. The sentence reads:

"Or, if it, in the form in which it was applied, might melt and run, it

was West's duty to apply it in a manner to protect against the consequences of its running *or warn the Colliers of this characteristic which might make it accessible to the children, so they could protect against such."*

The italicized part of the sentence is the part which is susceptible to the construction placed on it by the appellees. However, it was not our intention to sustain the jury's finding of negligence in the manner in which the phosphorus was applied on the ground there was a failure to warn. There was no pleading of such and no jury finding. What we actually hold is that a jury issue was raised concerning whether the phosphorus paste was negligently applied. The jury so found and there was sufficient evidence to support this finding. We hold that since there is evidence showing that it was applied in a manner so it melted and ran to a point where it was accessible to children, there was evidence to go to the jury on the issue as to whether the phosphorus was negligently applied.

The evidence is sufficient to support the finding. While Mr. West testified he applied it in such a manner it would not run, the Colliers testified that in fact it did run down the studs and to a point on the studs under the shelf where it was accessible to the child. This conflict in testimony was a matter to be resolved by the jury.

The balance of our opinion discussing failure to warn was directed to the question of whether the Colliers, not having been warned, were guilty, under all the evidence, of contributory negligence. We held, and hold, there was no evidence to support a finding of contributory negligence.

Appellees urge that we presumed the child obtained the phosphorus from the studs in the garage. We make no such presumption. What we do say is that the evidence, though circumstantial, presents a factual situation of probability that this was the source of the poison which resulted in the child's death. The jury issues were submitted very generally. The jury was asked if the appellees were guilty of negligence in the manner in which the phosphorus was applied and if this negligence was a proximate cause of the child's death. Under such submission the jury could have concluded that the negligence consisted in applying it to the studs in a manner so it would run and become accessible. We think the probability is that such was the jury's conclusion. Too, the jury could have concluded that it was from the studs under the shelf in the garage that the child got the poison. The evidence circumstantially, but with probability, points to this as the source, because other points of application were relatively inaccessible. Too, an inspection of the other points of application shows the form and pattern in which they were applied remained undisturbed. It is true, as pointed out by appellees, that Mrs. Collier, the child's mother, stated she inspected the studs in the garage after the child's death and did not see any evidence of a scraping of the phosphorus on the studs or any fingerprints. We attach no real significance to this because the evidence showed the phosphorus paste to be pliable and that it had run, where applied on the studs, in the heat of the month of June. Marks could well have originally been on the paste located on the studs, but additional running of the paste or expansion caused by the heat could well have obliterated the marks between the time of their making and the time of inspection. At least, the jury could well have reasoned in the light of all the testimony.

The statement in appellants' brief to the effect that no one knew where the child got the poison is no judicial admission. No one does know with absolute certainty where the poison was obtained, but it suffices legally if the evidence establishes the probability as to where it was obtained.

Appellees' motion for rehearing is overruled.