**REPUBLIC NATIONAL LIFE INSURANCE COMPANY, Appellant,**

v.

**Beatrice Lee BULLARD, Appellee.**

**No. 14522.**

Court of Civil Appeals of Texas.

Houston.

Feb. 3, 1966.

Rehearing Denied March 3, 1966.

J. W. Dewbre, Thomas G. Nash, Jr., Johnson, Guthrie, White & Stanfield, Curtis White, Dallas, for appellant.

W. T. Bennett and Mac L. Bennett, Jr., Huntsville, J. Edwin Smith, Houston (On Motion for Rehearing) for appellee.

BELL, Chief Justice.

This is an appeal from a judgment in the amount of $14,700.00, rendered against appellant by the court after a trial without a jury. The judgment represents recovery on a life insurance policy providing for double indemnity if the insured's death resulted solely from accidental bodily injury. Appellant paid the principal sum but denied liability for the additional $10,000.00 because of its belief that death resulted from or was contributed to by existing bodily infirmity.

The insured was Bobbie Lee Bullard, the husband of appellee. He was an employee of the State of Texas as Warden of the Darrington prison farm. The policy sued on is the group policy carried by State employees.

The policy provided that if the employee, as a result of accidental bodily injury, should suffer, directly and independently of all other causes, a loss of life, the appellant would pay additionally an amount equal to the principal sum. The policy also con-

tained an exclusion which provided that the insurance with respect to accidental death would not cover a loss caused or contributed to by bodily or mental infirmity.

There is no dispute concerning the evidentiary facts.

On June 6, 1963, two prisoners had escaped from the Ramsey prison farm. Mr. Bullard was assisting in the efforts to recapture them. He was riding a horse. He apparently joined in the hunt about 4 o'clock in the afternoon. The persons who saw him that day all testified he showed no signs of being ill, but to the contrary appeared happy and jolly. Bullard was riding for several hours. He was seen alive about dusk. He, when last seen alive, was heading toward a creek, his horse being in a fast lope. There were two other guards on horseback some distance ahead of him. They were all riding at a more or less loping run. The two other riders expected Bullard to overtake them. He did not do so, but his horse did. When the riderless horse appeared, one of the other men went back to look for Bullard. Mr. Osborn was the man who went to look for Bullard. Some distance back he found Mr. Bullard lying flat on his back on the ground. He was still gasping for breath. He appeared to be knocked out and gasping as would a person who has had the breath knocked out. He appeared to be unconscious. Mr. Osborn stayed with Bullard until he stopped gasping. The surrounding terrain was sloping, irregular and there were some cracks and holes in the ground. Mr. Bullard was lying to the right of the path, looking in the direction he had been riding, and approximately parallel to it. His hat was about 20 or 30 feet back in the direction from which he had come. The left rein of the bridle was over the horse's neck and the right rein was hanging to the ground. The horse was a large clumsy one. One witness testified he had on previous occasions seen this horse stumble to the extent of going to his knees, but had never seen him "go plumb down." There were no marks on the horse to indicate that it had

fallen to the ground. There were a few abrasions on Mr. Bullard's face. They were described as superficial. Mr. Bullard was wearing riding gloves. At the funeral home it was discovered by the mortician that Mr. Bullard had a chew of tobacco in his mouth. The mortician also described an abrasion on the right side of the face from the hairline to the jaw. The width was given as about two inches, but the depth is not given. It looked like a wound you would get from skidding on the ground. There were no abrasions or bruises on the back of the head. There were "markings, bruises and abrasions on the right shoulder and down the arm to the elbow." The witness noticed no facial discoloration, apart from the bruises and abrasions above described. The front of Mr. Bullard's shirt was torn and two or three buttons were missing.

It appears without dispute that beginning in June, 1955, Mr. Bullard had a coronary problem. This was fully described by Mr. Bullard's physician, Dr. Fatheree. It should here be noted that no doctor saw Mr. Bullard on the day of the occurrence in question. No autopsy was performed. When first seen in June, 1955, Mr. Bullard had hardening of the coronary arteries. At that time the doctor prescribed nitroglycerin and nicotinic acid. Shortly thereafter Mr. Bullard was hospitalized and at this time anti-coagulants were also prescribed. He was hospitalized because he had a particularly bad attack of chest pain. An electrocardiogram was made. A series of them was made during this period of hospitalization. They reflected some damage to the heart muscle. It was the doctor's opinion that Bullard had not had an outright coronary thrombosis, but rather a coronary insufficiency. This deprives the heart muscle of blood over a period of time and this causes changes to be shown in the electrocardiogram. The tests, after a week's hospitalization, indicated Mr. Bullard was getting along satisfactorily and could safely go home. He was advised to rest at home a while and then gradually re-

sume his work. He saw Mr. Bullard in July, August and September, 1955, and he seemed to be doing pretty well except he was having pains in his chest when he would lie down. In February, 1956, he continued to have slight angina at night when he lay down. This was caused by insufficiency of the heart muscle. While angina is usually brought on by activity, Mr. Bullard's came mostly at night when he lay down. This is not a rare situation but it is most usual for pain to come after activity. In September, 1961, an electrocardiogram showed slight abnormalities that hadn't shown up on previous visits. Mr. Bullard did not see the doctor in 1962. He next saw him in February, 1963. At that time Mr. Bullard's condition had gotten worse. He was having more angina, particularly at night. He was taking more nitroglycerin and at this time the doctor increased the dosage from 1/150th grain to 1/100th grain, and he was also put on a new drug with the hope of ameliorating the pain. This was the last time the doctor saw Mr. Bullard. The abnormality shown by the electrocardiograms was characterized by the doctor as being minimal. He had always advised Mr. Bullard to limit his activities somewhat and carry on all of his activities with moderation. The doctor was of the view Mr. Bullard never suffered myocardial infarction. It was his opinion the angina was the result of coronary insufficiency. The nitroglycerin dilates the arteries and the flow of blood to the heart is increased. Most frequently people who develop coronary thrombosis have a preliminary heart pain. This is the reason for the use of nitroglycerin. When the pain occurs it may be taken so as to dilate the arteries and increase the flow of the blood. People will in most cases have a warning from this pain and can take the nitroglycerin. While a person may suffer a coronary thrombosis without warning, in most instances, there will be some preliminary warning. The doctor was of the opinion that it was possible that any severe injury might lead to coronary thrombosis. When asked what was the meaning of "ventricular fibrillation", the doctor explained it means a condition in which the heart muscle, instead of contracting periodically as it does in beating, merely squirms like a bucket of worms, so there is no effective beat in the heart. He stated one of the common means or mechanisms of death following a coronary thrombosis is ventricular fibrillation. Mr. Bullard had a sclerotic condition. Ventricular fibrillation may come either with or without coronary thrombosis. However, for the most part persons who have ventricular fibrillation usually have coronary sclerosis. The doctor stated he had no firm opinion as to what caused Mr. Bullard's death. Rupture of a blood vessel can occur from trauma. He stated it was possible for death to result from a broken neck, a ruptured blood vessel, injury to the respiratory system, or brain injury, and that such injuries could be caused by a fall from a horse.

When Mr. Bullard last came to the doctor in February, 1963 with increased chest pain, the nitroglycerin dosage was increased to the strongest tablet normally sold. He stated that from the condition in which he found Mr. Bullard he would say Mr. Bullard was subject to having a heart attack at any time. He meant by this a thrombosis that would take his life. This could occur while he was exerting himself, while he was lying in bed, while he was asleep, or sitting and relaxed. In the latter years, when Mr. Bullard came to see him he did so because of increased chest pain. Without any accident the heart condition could be the cause of death. He considered Mr. Bullard had a really serious condition.

Mr. Bullard, and several persons who worked with Mr. Bullard, stated he was able to do his work without any noticeable limitation. Some of the witnesses did not know Mr. Bullard had a heart condition. Of course, Mrs. Bullard knew and knew of his medication, and testified of his obedience to doctor's orders. It appears that except for the time of his hospitalization in 1955, Mr. Bullard had missed no

period from work because of illness. His work encompassed executive or supervisory duties and also relatively vigorous exertion at times.

The principles of law applicable in a case of this kind are well settled. Difficulty is not in knowing what the law is, but in applying it to varying fact situations.

■ The burden is on the beneficiary to establish by a preponderance of the evidence that death resulted from bodily injuries caused by accident, directly and independently of all other causes. This, of course, encompasses a showing that death was not contributed to by existing bodily infirmity. Mutual Benefit Health & Accident Ass'n v. Hudman, 9 Supreme Court Journal 169 (S.Ct.); Robinson v. Aetna Life Ins. Co., 276 S.W. 900 (Tex.Com. App.); Tix v. Employers Casualty Co., 368 S.W.2d 105 (Tex.Civ.App.), no writ hist., and authorities there cited; Golden State Mutual Life Ins. Co. v. Summers, 301 S.W.2d 491 (Tex.Civ.App.), no writ hist.; and Standard Life & Accident Ins. Co. v. Roberts, 318 S.W.2d 757 (Tex.Civ.App.).

■■ Appellee relies on circumstantial evidence to show that the deceased suffered accidental bodily injuries and that they were the proximate cause of his death. Of course, resort may be had to circumstantial evidence to establish ultimate facts. Bock v. Fellman Dry Goods Co., 212 S.W. 635 (Tex.Com.App.); Collier v. Hill & Hill Exterminators, 322 S.W.2d 329 (Tex. Civ.App.), no writ hist. If from all the circumstances in evidence it may reasonably be concluded that death resulted from accidental injuries and was not contributed to by bodily infirmities, the claimant has discharged her burden. The claimant need not exclude every other reasonable hypothesis but if, in the light of all of the evidence, it can be said that accidental injuries, independently of all other causes and not contributed to by bodily infirmity, probably caused deceased's death, then there is evidence of probative force. It is a matter of probabilities in the light of all the evidence.

■ However, a court or jury may not be left to speculate. The evidence must give rise to more than a surmise or suspicion that death resulted solely from accidental injuries. If there is no direct evidence as to the existence of an ultimate fact and the proven circumstances are consistent with either of two theories and there is nothing to show that one rather than the other probably is correct, then neither is proven. Worley v. International Travelers Assur. Co., 110 S.W.2d 1202 (Tex.Civ. App.), writ dism.; International Travellers Ass'n v. Bettis, 120 Tex. 67, 35 S.W.2d 1040; Continental Cas. Co. v. Fountain, 257 S.W.2d 338 (Tex.Civ.App.), writ ref.

■ We have reached the conclusion that there is no evidence of probative force from which it may be reasonably inferred that Mr. Bullard's death resulted from accidental bodily injuries independently of all other causes and was not contributed to by bodily infirmity.

There certainly is no direct evidence of the cause of death. No autopsy was performed. No doctor saw deceased immediately before or after the occurrence immediately following which he died. The only doctor testifying stated, on a basis of his familiarity with Mr. Bullard's heart condition which he was treating, and a recital of the circumstances surrounding Mr. Bullard's death, that he could not give an opinion of the cause of death.

The evidence merely shows that Mr. Bullard, who was last seen riding a horse at a fast lope, was found lying on his back beside a traveled path, gasping for breath. He had bruises and abrasions such as might be received by one sliding along the ground after falling or being thrown from a horse that had been moving in a fast lope. These wounds were described as superficial. How deep they were is not shown. There appeared to be no broken bones in any body member. How Mr.

Bullard came to fall from the horse is not shown. Whether he fell when the horse stumbled or whether he suffered a heart attack and fell cannot be known from the evidence. Certainly, the wounds appearing on the body were not of such a serious nature as are likely to produce death.

Appellee, in analyzing the circumstances, stresses the evidence that though Mr. Bullard had a heart condition for which he was taking nitroglycerin he had not been to see a doctor since February, 1963, and had been able to do his work; that the history of his condition showed more angina pains while he was resting than when exercising; usually one suffering a coronary thrombosis has a warning of its approach by angina pains and can take the nitroglycerin; that Mr. Bullard, when found, was lying to the right of the path in the direction in which he was last seen riding; that people mount or dismount on the left side of a horse; that the left rein of the bridle was over the horse's neck; that Mr. Bullard was still wearing riding gloves; and that after his death he had a chew of tobacco in his mouth. From these circumstances, plus the statement of Mrs. Bullard that the deceased followed his doctor's orders as to taking his medicine, appellee reasons that he did not have a heart attack. Appellee seems to reason that if he was having a heart attack he would have received warning from angina pains; would at least have removed his gloves and taken the nitroglycerin, and may even have dismounted on the left side and then taken his medicine. Too, appellee points out that the particular horse was a clumsy horse and was known to frequently stumble and the terrain over which he was being ridden was rough.

The trouble with this analysis is that it assumes there would be angina pains of sufficient duration to afford time for Mr. Bullard to remove a glove, spit out the chew of tobacco, and take the medication while continuing to ride or else to dismount, remove a glove and take the medicine. It also assumes he had the nitroglycerin with him when no evidence shows such to be true. The evidence merely shows nitroglycerin was prescribed and Mrs. Bullard testified he was following his doctor's orders in taking his medicine. Nowhere does it appear he was told to always have the medicine with him, and the evidence shows he needed it mostly at night.

Too, what appellee overlooks is that the evidence shows the deceased's heart condition had gotten worse. His physician testified his condition was such that he could pass away at any time, either while he was exercising or just sitting or resting and without warning. Too, it shows that while usually there are warning pains, such is not always the case.

The evidence in this record is equally consistent with the conclusion that Mr. Bullard had a heart attack and fell from the horse. Too, the injuries undoubtedly received in the fall, whatever may have been the cause, were such as not to be reasonably calculated to cause death, so certainly there is no evidence of probative force to show that the bodily injuries independently of all other causes resulted in deceased's death and were not contributed to by his admittedly existing bodily infirmity.

The judgment of the trial court is reversed and judgment is here rendered that appellee take nothing.