**KIRBY PETROLEUM COMPANY,**
Appellant,

v.

**Mildred JONES et al., Appellees.**

No. 89.

Court of Civil Appeals of Texas.

Houston (14th Dist.).

April 10, 1968.

Rehearing Denied May 8, 1968.

**682**

See also Tex.Civ.App., 383 S.W.2d 610.

Raybourne Thompson, Jr., B. Jeff Crane, Jr., Vinson, Elkins, Weems & Searls, Houston, for appellant.

Hall W. Griggs, West Columbia, Frank T. Abraham, W. James Kronzer, Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellees.

TUNKS, Chief Justice.

This is a suit under the Texas Wrongful Death Statutes, Articles 4671–4678, Vernon's Ann.Tex.Civ.St. The decedent was J. Q. Jones. His survivors, authorized under Article 4675 to institute this suit, are his wife, his adult married daughter and his minor daughter. They were the plaintiffs in the trial court and are appellees here.

Kirby Petroleum Company was the defendant in the trial court and is appellant in this court. Appellant, sometimes referred to herein as "Kirby," was the owner and operator of a small oil and gas lease in Brazoria County near the city of West Columbia. There were two producing oil wells on the lease. These wells did not have enough gas pressure to flow so that the oil had to be pumped from them. Because it had no other production in the immediate vicinity, Kirby deemed it uneconomical to hire a full-time employee to operate the two pumping units on its lease. Rather, in keeping with a common practice in the petroleum industry under such circumstances, it entered into a contract with J. Q. Jones, whereby Jones, for a monthly fee,

agreed to operate the two pumping units, measure and record production and perform the other usual duties of an oil field pumper. Jones had similar contracts with other producers in the area. Jones was what is known in the industry as a "contract pumper."

It is admitted that Jones was an independent contractor and not an employee of Kirby. As such, he was an invitee while on Kirby's premises performing his services.

The pumping mechanism on Kirby's lease was of the type commonly seen in this part of the country. Briefly and simply described, it consisted of a beam, referred to by a witness as a rocking beam, resting on a fulcrum. To one end of the beam were connected the rods reaching to the bottom of the well. To the bottom of the rods a pump was attached. The rods, in turn, were inside tubing. When the rods to which the pump was attached moved up and down, the pump forced the oil up inside the tubing to the surface and on into storage tanks. The rods were caused to move up and down when the rocking beam was caused by an electric motor to rock back and forth on its fulcrum. The rods attached to the end of the rocking beam represented considerable weight. To offset this weight a counter-balance of comparable weight was attached to the other end of the rocking beam, thus reducing the power required to operate the pump. The weights of the various segments of the pumping unit are not revealed by the testimony, but pictures of them are in the record and it is obvious that tons of weight were involved in the rods, the rocking beam, counter-balance and the steel structural beams on which the fulcrum rested.

There is a brake on the pumping unit which is used to secure the rocking beam while the mechanism is being repaired. This brake is operated by pulling a hand lever. The force applied to the hand lever is transmitted through a series of connecting steel rods to the brake bank which, when applied, holds the rocking beam immobile. There is a ratchet on the brake handle so that the brake can be locked on. The first of the series of rods is about three-quarters of an inch in diameter and about five feet long and extends parallel to the ground surface. One end is attached to the brake lever. The other end is bent at a right angle and inserted through a hole in an eccentric which is connected to another rod which extends perpendicular to the ground level. At the point where the brake rod goes through the eccentric, it has a hole in it for a cotter pin. This cotter pin does not bear any of the force applied to the brake lever in activating the brake, but merely keeps the brake rod from working out of the hole in the eccentric.

On April 21, 1961, Jones went to Kirby's lease. No one knows exactly what he was doing there because he went alone and there was no eye witness to the occurrence. When he did not return to his home at dark, his wife became concerned for his safety. She asked her next door neighbor, Judge Thurman Gupton, Judge of the 23rd District Court, to go with her to find him. They drove to the Kirby lease where they found Jones' car parked some distance from one of the pumping wells. Because of the terrain, they, too, parked their car some distance away. Judge Gupton, with the aid of a flashlight, walked to the well where he found Jones' dead body pinned between the counter-balance on the end of the rocking beam and one of the steel beams in the framework of the pumping unit. He and Mrs. Jones then drove to a nearby house from which they telephoned for help.

Judge Gupton, along with a doctor, a constable and the man from whose house the calls were made, then returned to the scene. It was found that Jones' body was lying with his chest on a structural steel beam and the counter-balance resting on the upper part of his back. His left hand was grasping a perpendicular rod which was the second rod from the brake lever in the brake system. The brake handle was locked in the "on" position. There was no cotter

pin in the hole in the end of the first brake rod and it was disconnected from the eccentric. No cotter pin nor piece of one was found in searches made at the site that night and thereafter. The area, however, was such that it would have been most unlikely that the cotter pin would have been found if it was there.

From the facts it appeared that Jones had gone to the well site to work on the pumping unit; he set the brake to secure the rocking beam; while he was working under the heavy counter-balance the brake rod, because of the absence of the cotter pin, disconnected, allowing the counter-balance to descend on him, crushing him to death between it and the structural beam on which his chest lay. Certainly, from the evidence, the jury could have believed that the accident occurred in such manner.

In response to special issues the jury found: (1) just before the accident the brake mechanism was defective; (2) the defendant failed to make proper inspection of the brake mechanism; (3) such failure was a proximate cause of Jones' death; (4) the defendant failed to properly maintain the brake mechanism; (5) such failure was a proximate cause of the death. The jury also answered various special issues inquiring as to Jones' negligence favorably to the plaintiffs. On the damage issues, the jury found that Mrs. Jones had sustained a pecuniary loss resulting from the death in the amount of $60,000.00. The minor daughter sustained a loss of $12,000.00, and the adult married daughter, a loss of $3,000.00. The parties stipulated as to the reasonable funeral expenses. The trial court rendered judgment for the plaintiffs on the verdict and stipulations. The defendant has perfected an appeal.

The appellant's principal attack on the trial court's judgment is based on the proposition that the jury's findings of its negligence and proximate cause are not supported by the evidence. This attack is briefed in "no evidence," "insufficient evidence," and "against the preponderance of the evidence" points of error. The jury's findings of no negligence on the part of the decedent Jones are not challenged. The substance of the appellant's argument is to the effect that there is no evidence showing how long the critical cotter pin had been missing. Thus, there is no way of knowing that reasonably frequent inspections would have discovered its loss nor would reasonable maintenance have replaced it. We overrule these points of error.

The evidence showed that the pumping unit in question had been in operation six years at the time of the accident. Not one time during that period had Kirby made a safety inspection of the unit. Another contract pumper, experienced in the field in which the Kirby lease was located, testified that the conditions around oil wells in that area were highly corrosive, that an ordinary carbon steel cotter pin used on a pumping unit there would become badly corroded in six months' time, that a zinc coated or painted pin would last for a somewhat longer period of time, that it was customary among the producers in the field to have regular monthly inspections made, that one not in daily use of the equipment could more easily detect the dangerous defects and that it was not the custom for the contract pumpers, themselves, to make the safety inspections.

The evidence further showed that the brake would continue to work for an indefinite period of time after the cotter pin was gone. None of the force used in applying the brake bore on the cotter pin itself. For this reason the brake rod assembly would not disconnect immediately on removal of the pin so as to give the operator immediate notice that it was missing. Rather, the brake would continue to work until irregular and unknown forces would cause the connection to come apart.

Appellant cites Western Textile Products Co. of Texas v. Sidran, 153 Tex. 21, 262 S.W.2d 942, in support of the proposition that an invitor does not incur liability to an invitee because of failure to inspect where

the situation is such that an inspection, if made, would not have discovered the defects causing injury to the invitee. With that general proposition we agree. The appellant then cites Commercial Standard Ins. Co. v. Martin (Tex.Sup.Ct.), 363 S.W.2d 228, as supporting its argument that the rules stated in the Sidran case precludes recovery by these plaintiffs. We are of the opinion, however, that the facts of this case are clearly distinguishable from those in the Martin case. There was evidence in the Martin case that the accident was caused by a defect in the hydraulic system on a tractor. But there was no evidence as to what the defect was nor how long its development would require. In this case the nature of the defect (the absence of the cotter pin) was shown. Under the evidence, the jury could reasonably infer that the cotter pin was gone because it had never been inserted in the brake rods, because it had been eaten away by the corrosive substances around the well sites, or it could have been removed by someone.

Under the first two of those three possible inferences, it is obvious that the defect would have existed for sufficient time that reasonable inspections would have discovered it. If it was never inserted at all, the defect had continued for several years. If it was destroyed by the corrosion, that process would have taken at least six months and would have been discoverable before the pin was completely destroyed. Proper maintenance would have replaced the pin after the corrosion became evident.

The appellant argues that the third of the possibilities can as reasonably be inferred as either of the other two. We disagree. It is true that service crews infrequently came onto the premises to do heavy repairs to the pump unit, but there is no evidence that such a crew had worked on the pump in the recent past. In fact, the position of some of the equipment at the well site suggested that Jones, at the time of the accident, was making arrangements for such a crew to replace the bearing on which the rocking beam rested the next day. The conclusion that a member of such a crew had recently removed the cotter pin would be utterly speculative.

The only other person shown as having anything to do with the well was Jones, himself. The evidence showed that he had many years experience working in oil fields around equipment and machinery. He was a capable workman. He is certain to have known of the danger involved in working around this equipment with the cotter pin out of the brake rod. It is most improbable he would have placed himself under the heavy counter-balance if he had known of the defective brake mechanism, as he certainly would have known if he himself had removed the pin. It is much more reasonable to infer that the pin became defective from corrosion and dropped out of the brake rod. The cotter pin was never found and there is no direct evidence that it became defective through the slow process of corrosion during the time of which process the defect should have been discovered by inspection. "A fact, however, may be established by circumstantial evidence. The circumstantial evidence is sufficient if on the basis of probabilities it establishes the existence of the ultimate fact." Athens Canning Co. v. Ballard, Tex. Civ.App., 365 S.W.2d 369, 371, no writ hist.

We are of the opinion that the evidence supports the jury's findings of negligence and proximate cause. The evidence shows a breach of the duty to reasonably inspect and maintain the equipment. It also supports the jury findings that each of such breaches was an actual cause of the decedent's death and that such an event as occurred was foreseeable. The appellees cite many cases that are authoritative for our holding in this respect, examples of which are the following: Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853; Beaumont, S. L. & W. Ry. Co. v.

Schmidt (Com.App., opinion adopted), 123 Tex. 580, 72 S.W.2d 899; Bock v. Fellman Dry Goods Co. (Com.App., judgment adopted), 212 S.W. 635; Gammage v. Gamer Co. (Com.App., judgment adopted), 309 S.W. 389; Collier v. Hill & Hill Exterminators, Tex.Civ.App., 322 S.W.2d 329, 73 A.L.R.2d 1141, no writ hist.

■ Defendant objected to each of the five primary negligence special issues submitted by the trial court on the grounds that, "Said issue is redundant, duplicitous and multifarious, and makes more than one inquiry of the jury in one special issue." At no place in its objection to the charge (though there were as many as seventeen objections to some issues), did the defendant point out what specific ultimate facts were grouped together in the submission of any one of the issues. For this reason the quoted objection was not sufficiently specific in pointing out the error of duplicity or multiplicity in the issues (if any there were) to comply with the requirement of Rule 274, Texas Rules of Civil Procedure. McDonald v. New York Central Mutual Fire Ins. Co. (Tex.Sup.Ct.), 380 S.W.2d 545; Whitsom Co. v. Bluff Creek Oil Co., 156 Tex. 139, 293 S.W.2d 488; Frozen Foods Express v. Odom, Tex.Civ.App., 229 S.W.2d 92, writ ref., n. r. e.; McDonald, Texas Civil Practice, Vol. 3, p. 1139, Sec. 12.29.

■■ Defendant also excepted to each of the primary negligence issues on the grounds that it was a "general charge." Obviously the case was not submitted on a general charge which elicits from the jury only an answer that it finds for the plaintiff for a certain amount or that it finds for the defendant. The charge of the trial court submitted two separate grounds of liability, one of which was covered by three questions to the jury, each to be answered "We do" or "We do not" and the other was submitted in two such questions to be so answered.

■ The trial court submitted three separate damage issues—inquiring, with appropriate instructions, as to the pecuniary loss resulting to each of the three survivors of the decedent. The defendant objected to such form of submission of damages because the court did not ask the jury to first find the total pecuniary loss resulting from the death and then apportion the amount so found among the three plaintiffs. Appellant's points of error in this regard are overruled. The point was ruled on adversely to the appellant's contentions in Duncan v. Smith, Tex.Civ.App., 376 S.W.2d 877, reversed on other grounds; Duncan v. Smith (Tex.Sup.Ct.), 393 S.W.2d 798. As to each of the three plaintiffs in this case, the trial court was required, under law, to give a different instruction as to the matters which the jury could and could not consider in determining the amount of the pecuniary loss. There was no way that the jury could have found the total recoverable pecuniary loss resulting from the death of the decedent without determining, under the court's instructions, the recoverable loss sustained by each of the plaintiffs and adding those amounts together to determine the total loss. It would have been futile to require of the jury that it first find the total recoverable pecuniary loss and then apportion it among the three plaintiffs.

The judgment of the trial court is affirmed.

Affirmed.