**GREEN LIGHT COMPANY, INC., et al., Appellants,**

v.

**Kyle Elizabeth MOORE et al., Appellees.**

**No. 667.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

Sept. 20, 1972.

Ben Ramsey, Ramsey & Murray, Vincent Rehmet, Barrow, Bland, Rehmet & Lee, Houston, for appellants.

Alfred H. Ebert, Jr., Fred Knapp, Jr., James W. Dilworth, Andrews, Kurth, Campbell & Jones, Duncan Neblett, Houston, for appellees.

TUNKS, Chief Justice.

This is an appeal from a judgment overruling the defendants' pleas of privilege in a products liability case.

The principal plaintiff is Kyle Elizabeth Moore, a little girl who, on March 18, 1966, the date of the occurrence of the tragic event upon which this case is based, was two years old. Kyle's mother and father, Preston Moore, Jr., and Betty Kyle Moore are other plaintiffs, the father also suing in the capacity as Kyle's next friend. Kyle also maintains the suit through her court appointed guardian ad litem, Duncan Neblett. The defendants are Green Light Company, Inc. and Green Light Company of East Texas, Inc., distributors of an insecticide bearing the trade name "Green Light Systemic." It is alleged that Kyle sustained injuries as a result of the intake, either by mouth or by absorption through the skin, of such insecticide so distributed by the defendants. The plaintiffs' petition alleged both negligence and strict liability as grounds for recovery. The suit was filed in the district court in Harris County. The defendants, Texas corporations whose principal places of business are in Bexar County, filed pleas of privilege. The plaintiffs' controverting affidavit alleged exceptions to the defendants' privilege to be sued in Bexar County under Vernon's Tex.Rev.Civ.Stat.Ann., art. 1995, secs. 9a and 23. After a trial before the court, without a jury, the pleas of privilege were overruled. The defendants have duly appealed.

Appellants' original brief presents two points of error. The first is based upon the contention that "appellees failed to plead and prove a cause of action for 'negligence' against appellants under Subdivision 9a of Article 1995 V.A.T.S., on the venue hearing." The second point uses comparable language as to Subdivision 23 of the venue statute. The language of neither point designates any specific element or elements of the causes of action as to which the pleading or proof is said to be wanting. However, in their statement, argument and authorities under the two points appellants do identify the part of the plaintiffs' proof as to which their challenge is directed. They contend that there is no proof of the "cause in fact" element of the two causes of action pleaded by plaintiffs. Their contention is, as stated in their original brief, that "there is . . . no evidence connecting the illness (of Kyle) with a product distributed by these defendants." At no place, either by specific point of error or by statement, argument and authorities, do appellants, in their original brief challenge the proof of the other elements of plaintiffs' pleaded causes of action and exceptions to the venue statute. This opinion will, therefore, confine itself primarily to an examination of the evidentiary support for the finding of a connection between Kyle's illness and the product distributed by appellants.

The active ingredient of the Green Light Systemic, distributed by the defendants-ap-

pellants, is called Di-Syston. It is an organic phosphate poison. Organic phosphates were the basis of the nerve gases developed as a potential military weapon before and during World War II. Subsequent to that time organic phosphates, in various forms, have been widely used as insecticides.

Di-Syston is a very highly toxic material. The degree of its toxicity can be demonstrated by comparing it to Malathion, another organic phosphate insecticide, which is rather well known to home owners. Di-Syston is more than 400 times as toxic as Malathion. Di-Syston is readily absorbed through the skin and its comparative toxicity when so absorbed is equally as great.

The product which these defendants marketed as Green Light Systemic was furnished to them in bulk in 50 gallon—450 pound containers. Green Light Company, Inc. repackaged the product into one pound labeled containers and distributed it in Harris County and a surrounding area through its affiliate, Green Light Company of East Texas, Inc. The product was formulated by impregnating specially treated clay granules with Di-Syston. The Di-Syston content of the product so formulated and distributed was 2%.

On March 18, 1966, the day Kyle Elizabeth Moore became ill, the Moore family lived at 1026 Briar Ridge in Houston, Harris County, Texas. The house faced east. On the adjacent lots, to the north and to the south, were occupied residences. The house to the south of the Moore residence was 1030 Briar Ridge and that to the north was 1022 Briar Ridge. In the first week of March 1966 the neighbor at 1030 Briar Ridge bought from a Houston nursery a can of Green Light Systemic and applied it to a shrub growing on that side of his house which was toward the Moore residence. The insecticide was applied according to the directions on the can. It was sprinkled on the ground around the roots of the plant, worked into the soil and then watered. This treatment apparently was not effective. About March 15th the neighbor sprayed the plant with Malathion. A mixture of about six gallons of water and six tablespoonsful of Malathion were sprayed on the plant.

In about August of 1965 the next door neighbor to the north of the Moores bought a can of Green Light Systemic from a nursery in Houston. Upon acquiring it he applied it to 12 copper plants he had in pots sitting on a patio at the front of his house. Later in 1965 he applied the insecticide to the potted copper plants for the second time. In January of 1966 he made the third application of the insecticide to the potted plants. At the time of the second and third applications the plants had been moved into a greenhouse in the neighbor's back yard where they still remained on March 18 of 1966. The plants were in 12 inch clay pots which had holes in the bottom so that excess water could drain out. The floor of the greenhouse on which they sat was dirt. The applications made by this neighbor were, too, in accord with the directions on the container—pouring the granules on the dirt in which the plants were, then watered it so that it would soak into the soil.

Witnesses who saw Kyle in the afternoon of March 18th, up until about 5:00 o'clock, testified that she gave no indication that anything was wrong with her. At about 5:00 o'clock she was seen going into the back yard of the neighbor to the north of her home. She remained in the back yard unattended and unobserved for about five minutes when an older child was sent for her and brought her back to the front yard. Both the back yard and the inside of the greenhouse were apparently accessible to her.

At about 5:40 Mrs. Moore brought Kyle into the house and cleaned her up. Her hands and face were dirty. Mrs. Moore noticed that she was flushed. At 5:50 Mrs. Moore took Kyle with her in the car to pick up a baby-sitter. As they were returning home Mrs. Moore noticed saliva running out of the corner of Kyle's mouth.

Her temperature was taken. It was 101.4 degrees. A doctor was called and Kyle was taken to a hospital. Her stomach was pumped, she was bathed and was started on medication of atropine, an antidote for organic phosphate poison. Her condition continued to get worse. She became permanently and almost totally paralyzed. She suffered irreparable brain damage.

Soon after the onset of Kyle's illness Mr. Moore and a toxicologist led an extensive and detailed search and investigation in the neighborhood in an effort to learn of the presence of and use of poisonous substances therein. They did not discover the recent use of or the presence of any significant toxic substances except those discussed above—the Green Light Systemic and the Malathion.

Dr. George W. Salmon was the Moore's pediatrician. He was away from the city the day Kyle became ill. He returned two days later and began participating in her care and treatment. He described her symptoms as constricted pupils, excessive saliva, twitching and involuntary jerking movements and progressive paralysis. He testified that those were the characteristic symptoms of poisoning by an organic phosphate. He expressed the opinion that Kyle's condition was caused by dermal contact with an extremely toxic organic phosphate. He was of the opinion that the Malathion sprayed on the neighbor's shrub could not have been the cause, because of Malathion's relatively mild toxicity.

Other facts of significance are shown by the evidence. Green Light Systemic retains its toxic capacity for ten weeks or more after its application. When the granules are applied around the base of a plant, worked into the soil and watered, the toxic agent tends to rise to the surface.

The principal evidentiary fact upon which the appellants rely as the basis for their contention that the evidence did not preponderate in favor of a finding that Kyle's illness was caused by an exposure to Green Light Systemic is an entry made in the hospital record by Dr. Salmon on September 9, 1969. That entry was: "This child . . . had experienced what was believed to be anti-cholinesterase poisoning, *although the exact one was never identified beyond suspicion.*" (Emphasis added.)

■ We are of the opinion that the evidence before the trial court fully supported a deemed finding that Kyle's injuries were actually caused by her contact with the Green Light Systemic distributed by the defendants. It is true that there is no testimony by any witness who actually saw her come in contact with the substance. But a reasonable inference to be drawn from the facts which were proved by direct evidence is that she did so come in contact with the substance. Her childish nature, the presence of the substance in the areas in which she was seen just before she became ill, the sudden onset of her illness so soon thereafter, the development in her of symptoms classic of poisoning by such substance—all are circumstances consistent with such causation. The accessibility to Malathion, another organic phosphate, does not, in view of its relatively mild toxicity, preclude a reasonable inference that her very severe symptoms were produced by the Green Light Systemic. In order to sustain a finding of fact based upon circumstantial evidence it is not necessary to exclude "beyond suspicion" every other possible inference that could be drawn from the facts shown.

The case of Collier v. Hill & Hill Exterminators, 322 S.W.2d 329 (Tex.Civ.App.-Houston 1959, no writ) involved a situation quite similar to that presented by this appeal. There, in sustaining a finding of causal connection between the presence of a poisonous substance and a child's injuries, the Court, at page 337, said "Proximate cause may be established, the same as any other element of a cause of action, by circumstantial evidence. Bock v. Fellman Dry Goods Co., Tex.Com.App., 212 S.W. 635; Henry v. Publix Theatres Corp., Tex.Civ.App., 25 S.W.2d 695, error ref.; Tex.Jur., Vol. 30–B, Sec. 158. In applying

the rule, it is held that if a cause is shown that might produce an event and it being shown that an event of that particular character did occur, it may be inferred that the known possibility produced the result. Plaintiff is not required to exclude an appreciable chance that the event might have occurred in some other way. Expressed otherwise, a conclusion of causal connection may be inferred by a balance of probabilities. Bock v. Fellman Dry Goods Co., supra."

Other authorities supporting our holding on the question here presented are: Community Public Service Company v. Dugger, 430 S.W.2d 713 (Tex.Civ.App.-Texarkana 1968, no writ); McMillen Feeds, Inc. of Texas v. Harlow, 405 S.W.2d 123 (Tex. Civ.App.-Austin 1966, writ ref'd n. r. e.); Athens Canning Company v. Ballard, 365 S.W.2d 369 (Tex.Civ.App.-Houston 1963, no writ); and 2C. McCormick & R. Ray, Texas Evidence, sec. 1481 (2d ed. 1956).

■■■ The record in this case was filed on April 19, 1972. Appellants' original brief was due to be filed on May 19, 1972. Texas Rules of Civil Procedure rule 414. Upon an agreed motion timely filed on May 15, 1972, the time for filing that brief was extended by court order until June 9, 1972. Appellants' original brief, setting out the basis of their appeal as shown above outlined, was filed on June 9. Appellees' brief was due to be filed on July 5. Again by agreed motion duly and timely filed, the time for filing of appellees' brief was extended until July 21, upon which date it was filed. On July 12, the parties were notified that this case was set for submission and oral argument on September 13. On September 11, without prior notice to or permission from this Court and without prior notice to or agreement of opposing counsel, appellants filed what they designate "Appellants' Reply to Brief for Appellees." In their so-called reply appellants argue in support of grounds for reversal that were not included in their original brief. They contend that there is

no evidence showing negligence upon their part or that the product distributed by them was unreasonably dangerous. Appellees' counsel in oral argument protested this belated raising of new grounds for reversal. The new grounds for reversal set forth in appellants' second brief may not be considered. Reynolds v. Steves, 356 S. W.2d 200 (Tex.Civ.App.-San Antonio 1962, no writ). If they could be considered we would hold that the evidence supports a finding of negligent acts and omissions in Harris County at least on the part of the appellant, Green Light Company of East Texas, Inc., that were proximate causes of Kyle's injuries. We would also hold that the evidence supports a finding that the product here involved was so unreasonably dangerous that a reasonable person would not distribute it for use by home owners, and that the use of such product was a producing cause of Kyle's injuries.

The judgment of the trial court is affirmed.